# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH


### NO. 2-08-079-CV

---------

MALCOLM BARBER AND                                                      APPELLANTS
LEANN BARBER

V.

LEO C. MERCER, JR., M.D.                                                   APPELLEE

------------

FROM THE 78TH DISTRICT COURT OF WICHITA COUNTY

------------

## OPINION

------------

Appellants Malcolm and Leann Barber sued Leo C. Mercer, Jr., M.D., appellee, and others for negligence in the treatment and care of Malcolm's heart condition during a heart bypass procedure. Dr. Mercer was the general surgeon who assisted the lead surgeon by harvesting a saphenous vein from Malcolm's leg. This case currently involves only Dr. Mercer. The Barbers challenge the trial court's dismissal of their claim against Dr. Mercer for failure to comply with

the expert report requirements of the civil practice and remedies code. We reverse and remand.

**Factual and Procedural Background**

The Barbers sued numerous defendants, including Dr. Mercer, for negligence in connection with the diagnosis and surgical treatment of Malcolm's heart condition (an interlocutory appeal between the Barbers and several of the other defendants is currently pending in this court under cause number 2-07-353-CV). Malcolm underwent a multi-vessel coronary artery bypass graft (CABG) procedure at United Regional Health Care System in Wichita Falls, Texas, in early 2004. The surgery lasted over six hours, and afterwards, Malcolm suffered numbness, pain, and weakness in his left upper arm that led to a diagnosis of left ulnar nerve lesion and ulnar cubital syndrome. He required additional surgery and therapy and ultimately sued the physicians, nurse practitioners, and the hospital involved in his care for damages resulting from the padding and positioning of his arm. Dr. Mercer, a general surgeon, had assisted Mikko P. Tauriainen, M.D., a cardiovascular and thoracic surgeon, in performing the CABG procedure on Malcolm; Dr. Mercer was responsible for harvesting the left saphenous vein from Malcolm's leg.

In the Barbers' original petition they alleged multiple basis of negligence including specifically that the various defendants negligently failed to timely,

2

properly, safely, or adequately supervise or care for Malcom's condition during the CABG procedure and postoperatively, particularly relating to his "left upper extremity difficulties." Furthermore, the Barbers alleged that several of the defendant doctors failed to adequately train or supervise others who were assisting in Malcom's procedure.

After they filed suit, the Barbers timely filed their expert reports. Dr. Mercer objected to the Barbers' first expert report dated August 5, 2006 on the grounds that their expert, Jeffrey Alan Wagner, M.D., M.B.A., a board certified anesthesiologist, was not qualified to provide the report and that Dr. Wagner failed to provide a fair summary of his opinions in accordance with section 74.351(r)(6) of the civil practice and remedies code. Tex. Civ. Prac. & Rem. Code Ann. § 74.351(r)(6) (Vernon Supp. 2009). After a hearing on the issue in July 2007, the trial court specifically overruled Dr. Mercer's objections to Dr. Wagner's qualifications to opine, but it sustained his objections as to the report's failure to provide a fair summary of the applicable standard of care, breach of that standard as to each defendant, and causation under section 74.351.

On September 25, 2007, the trial court entered an order giving the Barbers thirty days to correct the defects in their first expert report as to Dr.

3

Mercer.[1]  The order stated, "[O]bjections to the Expert Report of Jeffery Alan Wagner, M.D. are hereby OVERRULED to the extent that such Objections challenge Dr. Wagner's qualifications to opine as an expert, pursuant to Sections 74.401 and 74.402 . . . ."  However, the trial court denied the Barbers' oral request to supplement *with a new expert* as to defendants Mercer, Robert Lee Moss, M.D., United Regional Health Care System, Inc., and Shellie Barnett-Wright, PA-C.  The Barbers immediately filed a more extensive report by Dr. Wagner, particularly expanded as to standard of care, breach, and causation as to each named defendant since the trial court had denied Dr. Mercer's objections to Dr. Wagner's qualifications.

After the Barbers filed their amended report through their same expert, Dr. Wagner, Dr. Mercer filed a second motion to dismiss, which the trial court granted on the sole ground that the expert was not qualified "to opine as an expert against Dr. Mercer."[2]  In all other respects, the trial court determined that the expert's amended report, dated September 28, 2007, "satisfies the

---

[1] The trial court dismissed some of the named defendants due to the insufficiency of the report, but the Barbers were given an opportunity to amend their report as to Dr. Mercer and some of the other defendants.

[2] Although it was the *same expert* supplying the amended report whom the trial court had previously found qualified, this time the trial court ruled that the expert was *not* qualified to render the report and limited its ruling to Dr. Wagner's lack of qualifications alone.

4

requirements of section 74.351 . . . as to Dr. Mercer, and all other objections by Dr. Mercer are overruled."  The trial court then granted Dr. Mercer's motion to dismiss him with prejudice.  The Barbers appealed.  *See* Tex. Civ. Prac. & Rem. Code Ann. § 51.014(a)(10) (Vernon 2008).

## Issue on Appeal

In the Barbers' sole issue on appeal, they contend that the trial court abused its discretion in granting Dr. Mercer's second motion to dismiss on the basis that Dr. Wagner was not a qualifying "expert" sufficient to give an opinion on whether Dr. Mercer departed from accepted medical care under the civil practice and remedies code.  Dr. Wagner's complete amended report is attached to this opinion as appendix "A."

## Standard of Review

Although the Barbers ask us to reevaluate the standard of review for expert report challenges, Texas courts and our supreme court, in particular, agree that review of a trial court's decision on a motion to dismiss under section 74.351 is subject to an abuse of discretion standard.  *See, e.g., Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 875 (Tex. 2001) (applying abuse of discretion standard to predecessor statute); *Craig v. Dearbonne*, 259 S.W.3d 308, 310 (Tex. App.—Beaumont 2008, no pet.); *San Jacinto Methodist Hosp. v. Bennett*, 256 S.W.3d 806, 811 (Tex.

5

App.—Houston [14th Dist.] 2008, no pet.); *Lal v. Harris Methodist Fort Worth*, 230 S.W.3d 468, 471 (Tex. App.—Fort Worth 2007, no pet.).  We have previously declined the opportunity to apply a de novo standard of review to this issue and therefore decline the Barbers' invitation now.  *Ctr. for Neurological Disorders, P.A. v. George*, 261 S.W.3d 285, 291 (Tex. App.—Fort Worth 2008, pet. denied).  Furthermore, a trial court's decision on whether a physician is qualified to offer an expert opinion in a health care liability claim is reviewed under an abuse of discretion standard.  *See Mem'l Hermann Healthcare Sys. v. Burrell*, 230 S.W.3d 755, 757 (Tex. App.—Houston [14th Dist.] 2007, no pet.).

To determine whether a trial court abused its discretion, we must decide whether the trial court acted without reference to any guiding rules or principles; in other words, we must decide whether the act was arbitrary or unreasonable. *Downer v. Aquamarine Operators, Inc*., 701 S.W.2d 238, 241–42 (Tex. 1985), *cert. denied*, 476 U.S. 1159 (1986).  Merely because a trial court may decide a matter within its discretion in a different manner than an appellate court would in a similar circumstance does not demonstrate that an abuse of discretion has occurred. *Id*. at 242.  A trial court does not abuse its discretion if it commits a mere error in judgment. *See E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 558 (Tex. 1995).

6

**Applicable Law**

In a health care liability claim, a claimant must serve on each defendant an expert report that addresses standard of care, liability, and causation no later than the 120th day after the claim is filed. Tex. Civ. Prac. & Rem. Code Ann. § 74.351(a), (j). If an expert report has not been served on a defendant within the 120-day period, then on the motion of the affected defendant, the trial court must dismiss the claim with prejudice and award the defendant reasonable attorney's fees and costs. *Id*. § 74.351(b). A report "has not been served" under the statute when it has been physically served but it is found deficient by the trial court. *Lewis v. Funderburk*, 253 S.W.3d 204, 207–08 (Tex. 2008). When no report has been served because the report that was served was found to be deficient, the trial court has discretion to grant one thirty-day extension to allow the claimant the opportunity to cure the deficiency. Tex. Civ. Prac. & Rem. Code Ann. § 74.351(c).

A report is deficient (therefore subjecting a claim to dismissal) when it "does not represent an objective good faith effort to comply with the definition of an expert report" in the statute. *Id*. § 74.351(*l*). While the expert report "need not marshal all the plaintiff's proof," *Palacios*, 46 S.W.3d at 878, it must provide a fair summary of the expert's opinions as to the "applicable standards of care, the manner in which the care rendered by the physician or health care

7

provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed." Tex. Civ. Prac. & Rem. Code Ann. § 74.351(r)(6).

To qualify as a good faith effort, the report must "discuss the standard of care, breach, and causation with sufficient specificity to inform the defendant of the conduct the plaintiff has called into question and to provide a basis for the trial court to conclude that the claims have merit." *Palacios*, 46 S.W.3d at 875. A report does not fulfill this requirement if it merely states the expert's conclusions or if it omits any of the statutory requirements. *Id*. at 879. The information in the report "does not have to meet the same requirements as the evidence offered in a summary-judgment proceeding or at trial." *Id*. When reviewing the adequacy of a report, the only information relevant to the inquiry is the information contained within the four corners of the document alone. *Id*. at 878; *see Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002). This requirement precludes a court from filling gaps in a report by drawing inferences or guessing as to what the expert likely meant or intended. *See Austin Heart, P.A. v. Webb*, 228 S.W.3d 276, 279 (Tex. App.—Austin 2007, no pet.) (citing *Bowie Mem'l Hosp.,* 79 S.W.3d at 53).

An expert report concerning standards of care for physicians "authored by a person who is not qualified to testify . . . cannot constitute an adequate

8

report." *Moore v. Gatica*, 269 S.W.3d 134, 140 (Tex. App.—Fort Worth 2008, pet. denied); *In re Windisch*, 138 S.W.3d 507, 511 (Tex. App.—Amarillo 2004, orig. proceeding); *see Ehrlich v. Miles*, 144 S.W.3d 620, 624–25 (Tex. App.—Fort Worth 2004, pet. denied). To be an "expert" on the departure from a physician's standard of care (therefore qualifying the submission of an expert report), a person must be a physician who

> (1) is practicing medicine at the time such testimony is given or was practicing medicine at the time the claim arose;
>
> (2) has knowledge of accepted standards of medical care for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim; and
>
> (3) is qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of medical care.

Tex. Civ. Prac. & Rem. Code Ann. § 74.351(r)(5)(A), § 74.401(a) (Vernon 2005). In determining the third element of this standard, courts must consider whether the physician who completed the report (1) is board certified or has other substantial training or experience in an area of medical practice relevant to the claim, and (2) is actively practicing medicine in rendering medical care services relevant to the claim. *Id*. § 74.401(c). In other words,

> there is no validity, if there ever was, to the notion that every licensed medical doctor should be automatically qualified to testify as an expert on every medical question. . . . [T]he proponent of the testimony has the burden to show that the expert possesses

special knowledge as to the very matter on which he proposes to give an opinion.

*Ehrlich*, 144 S.W.3d at 625 (quoting *Broders v. Heise*, 924 S.W.2d 148, 152–53 (Tex. 1996)).  For this reason, the offered report (along with the physician's curriculum vitae (CV)) must generally demonstrate that the expert has "knowledge, skill, experience, training, or education regarding the specific issue before the court which would qualify the expert to give an opinion on that particular subject."  *Id.* at 625 (quoting *Roberts v. Williamson*, 111 S.W.3d 113, 121 (Tex. 2003)).

However, "there are certain standards of medical care that apply to multiple schools of practice and any medical doctor."  *See Blan v. Ali*, 7 S.W.3d 741, 746 (Tex. App.—Houston [14th Dist.] 1999, no pet.).  Therefore, a physician "who is not of the same school of medicine [as the defendant] . . . is competent to testify if he has practical knowledge of what is usually and customarily done by a practitioner under circumstances similar to those confronting the defendant."  *Ehrlich*, 144 S.W.3d at 625; *see also Marling v. Maillard*, 826 S.W.2d 735, 740 (Tex. App.—Houston [14th Dist.] 1992, no writ).

**Analysis**

**Whether Law of the Case Applies**

After the next hearing on the adequacy of Dr. Wagner's amended report, this time the trial court determined that Dr. Wagner, a board certified anesthesiologist, was *not qualified* to give an opinion on Dr. Mercer's care but that *all of Dr. Mercer's other objections to Dr. Wagner's report were overruled* and that in all other respects the report had met the requirements of a section 74.351 expert report. Tex. Civ. Prac. & Rem. Code Ann. § 74.351. Because the only basis for the trial court's dismissal of the Barbers' claim against Dr. Mercer was based on its new determination that Dr. Wagner "fails to meet the qualifications to opine as an expert against Dr. Mercer," we too will focus on this ground.

Importantly, the trial court's initial order regarding Dr. Wagner's first report as to Dr. Mercer specifically overruled the defense objections to Dr. Wagner's qualifications to opine regarding Dr. Mercer's alleged negligence. Therefore, we must first decide the impact, if any, of the trial court's prior ruling that actually approved Dr. Wagner's qualifications and found his report lacking only on standard of care, breach, and causation.

Generally, once an issue has been litigated, that issue may not be relitigated. *See generally Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. John*

11

*Zink Co.*, 972 S.W.2d 839, 845–46 (Tex. App.—Corpus Christi 1998, pet. denied). And, in this particular case, Dr. Mercer filed an interlocutory appeal to this court challenging the trial court's denial of his objections to Dr. Wagner's qualifications and its alleged denial of his motion to dismiss based upon Dr. Wagner's qualifications. This court dismissed that appeal in a memorandum opinion for lack of jurisdiction to consider an interlocutory appeal of a trial court's failure to rule on a dismissal motion based on the inadequacy of an expert report and its grant of an extension of time to cure. *See Barber v. Barber*, No. 02-07-00353-CV, 2007 WL 4461411, at *1 (Tex. App.—Fort Worth Dec. 20, 2007, no pet.) (mem. op.). In doing so, we noted that the trial court had not ruled on Dr. Mercer's first motion to dismiss. *Id*. Dr. Mercer had tried to appeal "only the denial of his objections and motion to dismiss based on [Dr. Wagner's] lack of qualifications to opine against Dr. Mercer." *Id.*

At the hearing on the sufficiency of the amended report, the Barbers argued that Dr. Mercer had waived his current right to challenge the expert report because this, in essence, gave him two attempts to appeal. The unique posture of this case, however, is that our court dismissed the first interlocutory appeal for want of jurisdiction. Thus, there really has been no review of the trial court's initial overruling of Dr. Mercer's objection to Dr. Wagner's qualifications while at the same time sustaining Dr. Mercer's objections to the

12

report for failure to adequately set forth the standards of care, breach, and causation. In other words, the Barbers modified their first report to address the defects specifically enumerated by the trial court—those that went to the adequacy of the report regarding standard of care, breach, and causation—as opposed to the qualifications of their expert. They made virtually no changes to the initial report regarding Dr. Wagner's qualifications because the trial court had already overruled Dr. Mercer's objections to Dr. Wagner's qualifications. However, the law of the case doctrine is limited to questions of law determined by a court of last resort. *See generally City of Houston v. Jackson*, 192 S.W.3d 764, 769 (Tex. 2006); *Briscoe v. Goodmark Corp*., 102 S.W.3d 714, 716 (Tex. 2003); *Truck Ins. Exch. v. Robertson*, 89 S.W.3d 261, 264 (Tex. App.—Fort Worth 2002, no pet.). Thus, we will consider Dr. Wagner's qualifications to opine in this appeal.[3]

---

[3] We note some disparity with this determination: if the trial court had originally determined that Dr. Wagner was both unqualified to opine and that the report was inadequate, the Barbers likely would have modified their explanations of their expert's qualifications. Now, however, they have apparently used up their one-time extension, and the trial court has totally changed its mind regarding their expert's qualifications. Thus, the Barbers have been denied an opportunity to amend this aspect of their report even once. *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.351(c).

13

**Qualifications to Opine**

"[A] physician 'who is not of the same school of medicine [as the defendant] is competent to testify if he has practical knowledge of what is usually and customarily done by a practitioner under circumstances similar to those confronting the defendant.'" *Gatica*, 269 S.W.3d at 141 (citing *Ehrlich*, 144 S.W.3d at 625). In other words, such a physician may not be practicing in the "exact same field as the defendant physician, but instead must . . . be actively practicing medicine in rendering medical care services relevant to the claim." *Kelly v. Rendon*, 255 S.W.3d 665, 674 (Tex. App.—Houston [14th Dist.] 2008, no pet.). According to the Texas Rules of Evidence, which also provide guidance, we may look to "whether the offering party has established that the expert has knowledge, skill, experience, training, or education regarding the specific issue before the court." *Gelman v. Cuellar*, 268 S.W.3d 123, 128 (Tex. App.—Corpus Christi 2008, pet. denied) (citing Tex. R. Evid. 702; *Roberts*, 111 S.W.3d at 121). Furthermore, the court must ensure that the experts have expertise concerning the actual subject about which they offer opinions. *Reed v. Granbury Hosp. Corp.*, 117 S.W.3d 404, 410 (Tex. App.—Fort Worth 2003, no pet.).

Dr. Mercer's specific objections to Dr. Wagner's qualifications as set forth in his amended report and CV are based upon the allegation that Dr. Wagner is

14

unqualified to testify on the particular subject matter as required by sections 74.401(a) and 74.403(a) of the civil practice and remedies code. *See* Tex. Civ. Prac. & Rem. Code Ann. §§ 74.401(a), 74.403(a) (Vernon 2005).

In the trial court, Dr. Mercer objected to the fact that Dr. Wagner is an anesthesiologist as opposed to a general surgeon — as is Dr. Mercer — and simply stated that because Dr. Wagner is an anesthesiologist whereas Dr. Mercer is a board certified general surgeon and the case involved a surgical procedure, the Barbers failed to establish Dr. Wagner's qualifications with regard to the care provided by Dr. Mercer. Merely referencing paragraphs in Dr. Wagner's amended report however, without providing some analysis as to why they are insufficient, is not enough. *See* Tex. R. App. P. 33.1(a)(1)(A) (requiring party to object with sufficient specificity to make trial court aware of particular complaint); *Maris v. Hendricks*, 262 S.W.3d 379, 384–85 (Tex. App. — Fort Worth 2008, pet. denied) (holding that objections to adequacy of timely filed report are subject to preservation rules); *see also Gatica*, 269 S.W.3d at 141 (reiterating that physician of another specialty may be competent to testify about standard of care if he or she has knowledge of what is usually and customarily done by a practitioner under similar circumstances). Dr. Mercer did, however, continue with his objections, which he also raises on appeal.

15

Dr. Mercer challenges Dr. Wagner's CV, which admittedly does not show that he is a general surgeon but a board certified anesthesiologist, a fact already established. Dr. Mercer instead complains that Dr. Wagner's CV fails to show how Dr. Wagner has gained any "knowledge, training, or experience that would qualify him to opine on the standard of care of a general surgeon harvesting a vein." While it is true that Dr. Wagner's CV might not reveal such information when read in isolation, we are allowed, if not instructed, to consider the four corners of the report along with the CV when evaluating the expert's qualifications to opine on a particular subject. *Palacios*, 46 S.W.3d at 878; *Hansen v. Starr*, 123 S.W.3d 13, 20 (Tex. App.—Dallas 2003, pet. denied). Because we do not view Dr. Wagner's CV in isolation, this objection alone is an insufficient basis for the trial court's determination on Dr. Wagner's qualifications.

While Dr. Mercer then acknowledges that Dr. Wagner's amended report shows that he has "administered and managed medical anesthesia care and treatment to over 10,000 patients undergoing surgeries in a supine position, and . . . between 300 and 400 patients undergoing cardiac surgery," Dr. Mercer contends this experience is insufficient because it "does not establish how he could legitimately be qualified by training or experience to opine as to the scope of Dr. Mercer's duties and responsibilities as a general surgeon

16

harvesting a vein, or what Dr. Mercer should have known as a general surgeon harvesting a vein." However, excerpts from Dr. Wagner's amended report show otherwise. For example, in paragraph six, Dr. Wagner states, "I am familiar and experienced in . . . proper patient positioning to prevent peripheral neuropathies in the upper . . . extremities of patients . . . including *cardiac surgical procedures*." Dr. Wagner additionally says in paragraph seven,

> I have substantial personal knowledge and experience in the *medical diagnosis, care, and treatment* of adult patients undergoing general anesthesia for cardiac surgical procedures, and I am *familiar with the management of such procedures, including the positioning and padding of the patient and the patient's extremities in the prevention of perioperative peripheral neuropathies* under circumstances like or similar to Malcolm Barber['s]. . . . I am familiar with the *management* of such procedures, including the positioning and padding of the patient. . . . My *medical management* of adult patients undergoing general anesthesia for cardiac surgical procedures, and familiarity with the *management* of such procedures, including the positioning and padding of the patient . . . has included approximately 300 to 400 patients.

And in paragraph eight, Dr. Wagner further states,

> I also have substantial knowledge of the causal relationship between an anesthesiologist's [and] *general* and traumatic *surgeon's* . . . failures to meet the reasonable, prudent and accepted standards of *medical [and] health . . . care and supervision* in the diagnosis, care and treatment of patients undergoing general anesthesia for cardiac surgical procedures, . . . including the positioning and padding of the patient and the patient's extremities in the prevention of perioperative peripheral neuropathies under circumstances like or similar to Malcolm Barber['s] as of 2004. . . . Furthermore, I have substantial knowledge of the effectiveness or potential effectiveness of such

17

standards of *medical [and] health . . . care* for . . . general and traumatic surgeons . . . in the diagnosis, care, and treatment of patients undergoing general anesthesia for cardiac surgical procedures in the positioning and padding of surgical patients' extremities, and I am familiar with the *management* of the positioning and padding of the patient . . . .

And, finally in paragraph nine, Dr. Wagner says,

I have substantial knowledge of reasonable, prudent, and accepted standards of *medical, health*, nursing, and physician's assistant care applicable to anesthesiologists, *[and] general* and traumatic *surgeons*, . . . for the care and positioning and padding of the patient and the patient's extremities . . . . My knowledge of such standards of *medical*, nursing and physician's assistant care is based upon my above-described education, training and experience, my familiarity with the applicable *medical* literature, my familiarity with the applicable standards of *medical and health* care . . . that were applicable to all *general* and traumatic *surgeons . . . .* [Emphasis added.]

There is a repeating theme to Dr. Wagner's qualifications; he continually ties his education and training not only to his knowledge of anesthesia care during a cardiac procedure, but also to the medical and health standards of care for general surgeons like Dr. Mercer, who perform cardiac procedures that involve positioning and padding of a patient. He clearly identifies that he has acquired training and experience in studying, learning, and observing the appropriate standards for general surgeons with regard to their obligations for the positioning and padding of their medical patients. *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.401(a)(3).

18

In this case, it is also important to note that the alleged medical negligence does not relate to a particular failure regarding the cardiac or general surgeons' performance of the actual operating techniques. Here, the alleged breach relates specifically to the padding and positioning of the patient and his extremities during the procedure. The padding and positioning of a patient during surgery is common to surgeries generally, and Dr. Wagner quite clearly and repeatedly makes clear that he has knowledge, training, and experience regarding the medical and surgical management duties of the general surgeon during surgical procedures.[4]

For all the foregoing reasons, we believe that the trial court's initial ruling denying Dr. Mercer's objections to Dr. Wagner's qualifications was correct. We therefore conclude that the Barbers' expert, Dr. Wagner, is qualified to render an opinion under section 74.401(a) and (c), as well as section 74.403, as to a general surgeon's duty regarding the proper positioning and padding of a cardiac surgical patient. Tex. Civ. Prac. & Rem. Code §§ 74.401(a), (c), 74.403(a). We therefore also determine that the trial court abused its

---

[4] Although Dr. Mercer notes allegations against him that go beyond the positioning and padding of the extremities in a surgical procedure and requests that we affirm the dismissal as to those allegations, it is quite clear that the Barbers' complaints regarding Dr. Mercer in the appeal relate only to his failure to manage the positioning and padding of a patient's extremities as shown by their concession in their reply brief.

19

discretion in sustaining Dr. Mercer's objections to the qualifications of the Barbers' expert upon the filing of their amended report. We sustain the Barbers' sole issue and reverse and remand this case to the trial court for further proceedings.

TERRIE LIVINGSTON
JUSTICE

PANEL: CAYCE, C.J.; LIVINGSTON and MEIER, JJ.

CAYCE, C.J. concurs without opinion.

DELIVERED: October 15, 2009



Anesthesia since 1985 and a Diplomate to the National Board of Medical Examiners since 1982.

3.      I have been actively engaged in practicing medicine as the term is defined below from 1982 to the present time. I am practicing medicine as of the date of this report and at the time the claim arose in this case in January 2004. For the purposes of this report, I have reviewed the provisions of the Texas Civil Practice and Remedies Code, Chapter 74, Sections 74.351(r) (5) (A) and 74.401, stating that "'practicing medicine' or 'medical practice' includes, but is not limited to, training residents or students at an accredited school of medicine or osteopathy or serving as a consulting physician to other physicians who provide direct patient care, upon the request of such other physicians."

4.      My formal educational and training background includes graduation from State University of New York (S.U.N.Y.) at Buffalo, Buffalo, New York with a Bachelor of Arts (B.A.) degree in Biology in 1975, and Michigan State University College of Medicine, East Lansing, Michigan with a Medical Doctor (M.D.) degree in 1979. I received my internship training at St. Raphael Hospital, New Haven, Connecticut from 1980 to 1981, and I received my residency training in anesthesiology at Yale New Haven Hospital, New Haven, Connecticut from 1980 to1982. I also received my Masters in Business Administration (MBA) from the University of South Florida, Tampa, Florida in 1997.

5.      My educational background and training, certifications and licensure, professional positions I hold or have held, my special appointments and positions held, my hospital affiliations, and my professional society memberships are truly and correctly listed on my curriculum vitae, a true and correct copy of which is attached as *Exhibit A* to this report and fully incorporated by reference in this report.

6.      As a practicing anesthesiologist, I am familiar and experienced in the preoperative evaluation, airway management, proper patient positioning to prevent peripheral neuropathies in the upper and lower extremities of patients, and administration of anesthesia to patients undergoing surgical procedures, including cardiac surgical procedures.

7.      I have substantial personal knowledge and experience in the medical diagnosis, care, and treatment of adult patients undergoing general anesthesia for cardiac surgical procedures, and I am familiar with the management of such procedures, including the positioning and padding of the patient and the patient's extremities in the prevention of perioperative peripheral neuropathies under circumstances like or similar to Malcolm Barber. As an anesthesiologist, I have provided and performed the diagnosis, care, and treatment of patients undergoing general anesthesia for cardiac surgical procedures, and I am familiar with the management of such procedures, including the positioning and padding of the patient and the patient's extremities in the prevention of perioperative peripheral neuropathies. Since 1982, I have administered and managed medical anesthesia care and treatment to over 10,000 patients undergoing surgeries in a supine position, and I have administered and managed medical anesthesia care and treatment to between 300 and 400 patients undergoing cardiac

surgery. My medical management of adult patients undergoing general anesthesia for cardiac surgical procedures, and familiarity with the management of such procedures, including the positioning and padding of the patient and the patient's extremities in the prevention of perioperative peripheral neuropathies in patients' upper and lower extremities, has included approximately 300 to 400 patients. Additionally, I have extensive experience working cooperatively with nurses and physicians assistants in the nursing and physician assistant care and treatment of patients undergoing general anesthesia for cardiac surgical procedures, and I am familiar with the management of such procedures, including the positioning and padding of the patient and the patient's extremities in the prevention of perioperative peripheral neuropathies under circumstances like or similar to Malcolm Barber. My experience in these areas includes working cooperatively with nurses and physician's assistants in the positioning and padding of the patient and the patient's extremities for the prevention of perioperative peripheral neuropathies.

8. I also have substantial knowledge of the causal relationship between an anesthesiologist's, general and traumatic surgeon's, registered nurse's, and physicians assistant's failures to meet the reasonable, prudent and accepted standards of medical, health, nursing and physicians assistant care and supervision in the diagnosis, care and treatment of patients undergoing general anesthesia for cardiac surgical procedures, and I am familiar with the management of such procedures, including the positioning and padding of the patient and the patient's extremities in the prevention of perioperative peripheral neuropathies under circumstances like or similar to Malcolm Barber as of 2004. I also have substantial knowledge of the causal relationship between a hospital's failures to meet the reasonable prudent and accepted standards of nursing care by and through its nursing employees, agents and/or servants as well as the causal relationship between a nurse's failures to meet the reasonable prudent and accepted standards of nursing care and treatment in the positioning and padding of the patient and the patient's extremities in the prevention of perioperative peripheral neuropathies under circumstances like or similar to Malcolm Barber as of 2004. Furthermore, I have substantial knowledge of the effectiveness or potential effectiveness of such standards of medical, health, nursing and physician assistant care for anesthesiologists, general and traumatic surgeons, registered nurses, and physicians assistants, in the diagnosis, care, and treatment of patients undergoing general anesthesia for cardiac surgical procedures in the positioning and padding of surgical patients' extremities, and I am familiar with the management of the positioning and padding of the patient and the patient's extremities in the prevention of perioperative peripheral neuropathies under circumstances like or similar to Malcolm Barber.

9. I have substantial knowledge of reasonable, prudent, and accepted standards of medical, health, nursing, and physician's assistant care applicable to anesthesiologists, general and traumatic surgeons, registered nurses, and physicians assistants for the care and positioning and padding of the patient and the patient's extremities in the prevention of perioperative peripheral neuropathies under circumstances like or similar to Malcolm Barber as of 2004. My knowledge of such standards of medical, nursing and physician's assistant care is based upon my above-described education, training and experience, my familiarity with the applicable medical literature, my familiarity with the applicable standards of medical and health

care equally developed among anesthesiologists, cardiovascular and cardiothoracic surgeons, general and traumatic surgeons, nurses, and physicians assistants in the positioning and padding of patients and the patient's extremities for the prevention of perioperative peripheral neuropathies under circumstances like or similar to Malcolm Barber as of 2004, my familiarity with the minimum standards of reasonable, prudent and accepted medical, nursing, and physician assistant's practices for the assessment, care and treatment of surgical patients in the prevention of perioperative peripheral neuropathies under circumstances like or similar to Malcolm Barber as of 2004, and my familiarity with the standards of reasonable, prudent and accepted standards of medical, nursing, and physician assistant's care and treatment of surgical patients for the prevention of perioperative peripheral neuropathies that were applicable to all general and traumatic surgeons, nurses, and physicians assistants, under circumstances like or similar to Malcolm Barber in the United States as of 2004.

10. I, therefore, consider myself qualified to render observations, findings and opinions on the medical, nursing, and physician assistant's care rendered to Malcolm Barber by and through Robert Lee Moss, M.D., Leo C. Mercer, Jr., M.D., Shellie Barnett-Wright, PA-C, and United Regional Health Care System, Inc., by and through its nursing employees, agents and/or servants, including W. Alexander, R.N. and S. Syptak, R.N., as to whether they met the reasonable, prudent and accepted standards of medical, nursing and physician assistant care expected of anesthesiologists, general and traumatic surgeons, registered nurses, and physicians assistants caring for the positioning and padding of surgical patients and their extremities in the prevention of perioperative peripheral neuropathies under circumstances like or similar to Malcolm Barber in 2004.

11. I have been retained by the Keith Law Firm, P.C., attorneys for the Plaintiffs Malcolm Barber, a former patient of the Defendants Robert Lee Moss, M.D., Leo C. Mercer, Jr., M.D., Shellie Barnett-Wright, PA-C, and United Regional Health Care System, Inc., by and through its nursing employees, agents and/or servants, including W. Alexander, R.N. and S. Syptak, R.N., as well as for his wife, Leann Barber, and I have been asked to review the circumstances involved in the medical, physician's professional association, nursing and physician assistant care and treatment relating to the positioning and padding of Malcolm Barber and his extremities during his coronary artery bypass graft surgery, including the harvesting of his left radial artery, as well as the cause and manner of his left upper extremity peripheral neuropathy. Therefore, I have reviewed and studied the documents, records, materials and information listed below.

12. In order to develop my observations, findings and opinions, I have obtained and received information from the following records and sources: (1) David Huang, M.D. medical records relating to Malcolm Barber; (2) United Regional Health Care System (admission 01-19-04) medical records relating to Malcolm Barber;(3) United Regional Health Care System (admission 01-20-04) medical records relating to Malcolm Barber; (4) United Regional Health Care System (admission 01-26-04) medical records relating to Malcolm Barber; (5) United Regional Health Care System (admission 02-16-04) medical records relating to Malcolm Barber; (6) United Regional Health Care System (admission 03-23-04) medical records relating

to Malcolm Barber; (7) United Regional Health Care System (admission 08-06-04) medical records relating to Malcolm Barber; (8) United Regional Health Care System (admission 08-25-04) medical records relating to Malcolm Barber; (9)United Regional Health Care System (admission 08-04-99) medical records relating to Malcolm Barber; (10) United Regional Health Care System (admission 07-11-02) medical records relating to Malcolm Barber; (11) United Regional Health Care System (admission 07-16-02) medical records relating to Malcolm Barber; (12) United Regional Health Care System (admission 12-02-02) medical records relating to Malcolm Barber; (13) United Regional Health Care System (admission 04-24-03) medical records relating to Malcolm Barber; (14) United Regional Health Care System (admission 05-13-03) medical records relating to Malcolm Barber; (15) United Regional Health Care System (admission 05-21-03) medical records relating to Malcolm Barber; (16) United Regional Health Care System (admission 06-01-03) medical records relating to Malcolm Barber; (17) United Regional Health Care System (admission 07-29-03) medical records relating to Malcolm Barber; (18) United Regional Health Care System (admission 08-01-03) medical records relating to Malcolm Barber; (19) United Regional Health Care System (admission 12-01-03) medical records relating to Malcolm Barber; and (20) my telephone conversation on August 4, 2006 with Malcolm Barber.

13. Based upon my review of the above-mentioned materials and information, it is my observation and opinion that a brief summary of events that most likely occurred in the pertinent medical, nursing, and physician assistant's care and treatment of Malcolm Barber is as follows:

On January 19, 2004 , Mr. Malcolm Barber, a 69 year-old white male, 5'10" in height and weighing about 175 pounds, was admitted to United Regional Health Care System (URHCS) for the purposes of evaluating his cardiac status. Mr. Barber underwent a left heart catheterization, left ventriculogram and coronary angiography performed by Soe-Ni Nick Kong, M.D. (Dr. Kong). This procedure resulted in a diagnosis of Mr. Barber's three vessel atherosclerotic coronary artery disease with 70% left main ostial stenosis, 30% mid stenosis fo the left anterior descending coronary artery, 60% ostial and 60% mid stenosis of the left circumflex artery, 80% ostial stenosis fo the ramus intermedius branch and 70% ostial stenosis of his right coronary artery. Dr. Kong requested and obtained a consultation from Peter Tauriainen, M.D. (Dr. Tauriainen), a cardiothoracic surgeon. Dr. Tauriainen evaluated Mr. Barber, and assessed that a five vessel coronary artery bypass graft surgical procedure was indicated for him.

On January 26, 2004, Mr. Barber was admitted to URHCS for the coronary artery bypass graft (CABG), that was to be performed by Dr. Tauriainen, William Dean, M.D. (Dr. Dean), a cardiovascular and thoracic surgeon, and Shellie Barnett-Wright, PA-C (Barnett-Wright), a physician assistant. Prior to surgery, Mr. Barber had normal use of his right and left upper extremities and no history of any upper extremities neuropathies. In the CABG surgery, Mr. Barber was placed in the supine position on an operating table, and administered general

anesthesia by Robert Moss, M.D (Dr. Moss), an anesthesiologist. Dr. Moss, Dr. Tauriainen, Ms Barnett-Wright, and URHCS nurses W. Alexander, R.N. and S. Syptak, R.N. were also involved in directing, supervising, performing, or assisting with the positioning of Mr. Barber's body during the surgical procedure, including the positioning of his left arm. Dr. Tauriainen was assisted during the CABG procedure by Leo Mercer, M.D. (Dr. Mercer) and Ms. Barnett-Wright. Dr. Tauriainen utilized a "three team approach" with regard to the harvesting of Mr. Barber's left radial artery, left saphenous vein and left internal mammary artery. All three harvest sites were performed simultaneously. Dr. Tauriainen performed the left internal mammary artery harvest as Dr. Mercer harvested the left saphenous vein, and Ms. Barnett-Wright performed the left radial artery harvest from Mr. Barber's left forearm. Mr. Barber's left arm was extended out on an "Olympic table." Also, Dr. Dean was present in the operating room for a portion of time during the CABG procedure on Mr. Barber. After the left radial artery harvest, which was started at approximately 11:00 a.m. and ended approximately 11:45 a.m., Mr. Barber's left arm was then "tucked" by Dr. Moss with the assistance of W. Alexander, R.N. and S. Syptak, R.N. according to the hospital intraoperative report. Mr. Barber's surgical dressing for his left upper extremity was recorded in the operating room nurses notes as "steri-strips, 4 X 4's, ABD and an ACE wrap." According to the anesthesia and operative records, it appears that Mr. Barber's left arm was not properly positioned and padded since these procedures were not documented in the record. Dr. Tauriainen decided not to perform the five vessel graft previously planned and performed a four vessel coronary artery bypass graft. The duration of the surgical procedure was approximately 6 hours, 15 minutes. After surgery, Mr. Barber was transported to the Intensive Care Unit (ICU) at URHCS at approximately 5:45 p.m.

According to Mr. Barber, after he awoke from his general anesthesia, he was experiencing left arm and hand pain, swelling, constant throbbing and burning, and left hand numbness, particularly his ring and pinky fingers and that side of his hand extending into his wrist. Mr. Barber states that he reported his left arm, hand, and wrist conditions to Dr. Taurianinen, Dr. Dean and the URHCS hospital nursing staff, and that Dr. Taurianinen, Dr. Dean and the nurses told him that his left arm and hand conditions were fairly common and normal and should subside in a few days. However, Mr. Barber continued to experience pain, aching, burning, swelling, and numbness in his left hand and wrist throughout his hospital course. When Mr. Barber was discharged from the hospital, his left hand and arm were still in the same condition even though some of the swelling had gone down, and he was told by his doctors and nurses that his left arm and hand pain and other problems would go away in a week or two.

Postoperatively, Mr. Barber continued to experience his left hand and arm pain, numbness, burning and other problems, and he eventually saw Dr. Taurianinen

who told him that his ulnar nerve was probably stretched but should probably return to normal in four to six weeks. Dr. Taurianinen arranged for Mr. Barber to be seen by a Dr. Radkar, a neurologist. After testing of Mr. Barber's left arm and hand, Dr. Radkar assessed that he had damage to his ulnar nerve and Dr. Radkar prescribed occupational therapy and a pain medication. Thereafter, Mr. Barber experienced some improvement in his left arm, but he continued to experience severe pain and disability to the outside part of his left hand. Dr. Radkar arranged for Mr. Barber to be seen by a Dr. Workman, a pain management specialist, and Dr. Workman treated him with hydrocodone and neurontin. These treatments proved to be unsuccessful as he continued to experience pain, aching, burning, swelling, and numbness in his left hand and wrist and inability to use a portion of his left hand. In about July 2004, Mr. Barber consulted David Huang, M.D. (Dr. Huang), an orthopaedic surgeon, for his left arm and hand difficulties. Dr. Huang diagnosed Mr. Barber with a left ulnar nerve lesion and left ulnar cubital syndrome. Dr. Huang recommended surgical treatment for this condition. On August 25, 2004 Dr. Huang performed surgery on Mr. Barber's left upper extremity at URHCS consisting of a left ulnar nerve intramuscular transposition and Z-lengthening of the flexor muscle at the elbow. Following this operation, Mr. Barber reports that he has continued to experience numbness, weakness, atrophy, stiffness, difficulties with grasping objects and other problems with his left arm, including his hand and wrist areas. HE states that his left ring finger and little finger are still swollen and numb, he cannot close either finger, and since this is his dominant hand, he still has trouble trying to write. Further, Mr. Barber states that he has experienced significant disabilities in the use of his left hand and wrist in performing his job duties and responsibilities as a claims representative involving the evaluation and adjustment of large or catastrophic property damage claims. Also, Mr. Barber reports that he continues to experience numbness, atrophy, stiffness in his left hand, particularly his ring and small fingers, and resulting great difficulty in grasping with his left hand and using his left hand to perform his job duties as a insurance claims representative, including great writing difficulties.

14. In my opinion, the reasonable, prudent, and accepted standards of medical care applicable to Defendant Robert Lee Moss, M.D. (Dr. Moss) under the same or similar circumstances involved in the care and treatment relating to the positioning and padding of Malcolm Barber's left upper extremity; the care and treatment rendered by Dr. Moss for Mr. Barber which did not meet these standards in 2004; and the causal relationship between such failures and the injury, harm or damages of Mr. Barber, were as follows:

a. Dr. Moss should have appreciated that his role as the anesthesiologist during Mr. Barber's CABG procedure required that he provide appropriate management of the positioning of Mr. Barber's extremities, including his left upper extremities, in order to avoid a perioperative peripheral neuropathic injury to the patient. In that regard, Dr. Moss should have

appreciated that it was the anesthesiologist's responsibility to ensure proper patient positioning and padding of the patient during surgical procedures involving general anesthesia to the patient and that this responsibility related to both situations in which he performed the positioning of the patient and/or provided the padding to the patient, as well as situations in which those procedures were performed by another member of the health care team (i.e. nurse or physician assistant, etc.). Dr. Moss should have appreciated that the anesthesiologist's role to ensure proper patient positioning and padding during surgical procedures in which the patient received general anesthesia was necessary because the effects of the drugs and medications provided by the anesthesiologist to induce a state of general anesthesia rendered the patient completely unconscious and unable to protect his extremities from injury due to improper positioning and/or padding, as well as unable to indicate feelings of uncomfortableness or pain which would be the first indications of potential injury or risk of injury due to the positioning and/or padding problem. That is, Dr. Moss should have appreciated that anesthesiologists had the responsibility to ensure that patients were properly positioned and received proper padding in order to prevent perioperative peripheral neuropathies whether they themselves performed the positioning and padding of the patient or whether it was done by another member of the health care team because it was the responsibility of the anesthesiologist to provide continued management over all aspects of the patient's surgical procedure throughout the duration of the surgical procedure. Although different members of the health care team regarding a particular surgical procedure may be involved in or participate in the positioning of the patient and/or padding of the patient, Dr. Moss should have appreciated that it was the responsibility of the anesthesiologist to provide continued oversight and monitoring of the positioning and/or padding of the patient during surgical procedures; that this responsibility required that he ensure that the patient was properly positioned and padded throughout the duration of the surgical procedure; and that if the patient received improper positioning and/or padding at any time during the surgical procedure, it was his responsibility to either correct the positioning and/or padding problem himself or to provide orders that would lead to the patient being properly positioned and padded.

The responsibility of the anesthesiologist to provide for the proper positioning of the patient and the proper padding of the patient either directly or indirectly through the supervision of this process by other health care team members (i.e. other physicians, nurses, physician assistants, etc.) in order to prevent perioperative peripheral neuropathic injury(ies) to the patient was well known throughout the anesthesia

community in the United States as of January 2004. Additionally, this was also a well known concept within the other medical, surgical, operating room nursing, physician assistant, nurse anesthetist, and surgical scrub technician communities as of January 2004. Moreover, the reasonable, prudent and accepted standards relating to the proper positioning of patients and the proper padding of patients during surgical procedures in which the patient undergoes general anesthesia in order to prevent perioprative peripheral neuropathies were well known within the anesthesia, surgical, operating room nursing, physician assistant, nurse anesthetist, surgical scrub technician, etc. communities as of January 2004. Specifically, this information was available to physician anesthesiologists for several decades prior to January 2004 in that it was taught to anesthesiologists during their training (generally during medical school and to a greater degree during anesthesia residency training), as well as being well documented concepts in the peer review and other literature which were widely available and accessible to all physician anesthesiologists within the United States as of January 2004.

Therefore, at the time of Mr. Barber's CABG surgical procedure at URHCS on January 26, 2004, Dr. Moss should have been well cognizant not only of his responsibility to ensure that Mr. Barber was positioned and padded in an appropriate manner throughout the surgical procedure in order to prevent a perioperative peripheral neuropathic injury; that this remained his responsibility whether he provided the positioning and padding of Mr. Barber or whether those actions were provided by another member of the health care team (i.e. nurse, physician assistant, surgeon, etc.) because of his continued responsibility to monitor and supervise the positioning and padding of Mr. Barber to ensure that appropriate techniques were utilized; and he should have been cognizant of the proper techniques which should be utilized to properly position and pad Mr. Barber during the CABG procedure in order to prevent the occurrence of a perioperative peripheral neuropathic injury to Mr. Barber.

Specifically, Dr. Moss had a responsibility to properly position and pad Mr. Barber's left and right upper extremities before the start of the CABG surgical procedure, during the left radial artery harvest, after the left radial arterey harvest and during the remainder of the surgery in order to prevent peripheral neuorpathies to Mr. Barber's upper extremities and/or to continually monitor and supervise the positioning and padding of Mr. Barber's right and left upper extremities during the various stages of the CABG procedure set forth above and to ensure that Mr. Barber was positioned and padded in appropriate manners utilizing proper techniques during each stage of the surgical procedure; and as a reasonably prudent anesthesiologist, he should have been aware of his responsibilities in that



regard. Moreover, Dr. Moss should have known that of the major nerves in the upper extremities, the ulnar nerve and brachial plexus nerves are and were the most common nerves to be at risk of injury and to become symptomatic and lead to major disability of a patient during and after the perioperative period. Improper surgical patient positioning and padding of upper extremities were well known causative factors in the development of surgical patients' ulnar neuropathies as of 2004 and such risks had been known by the anesthesia, surgical, physician assistants, hospital, and operating room nursing communities in the United States for many years. As of 2004, reasonably prudent anesthesiologists were or should have been aware that surgical patients in supine positions were at risk of developing ulnar nerve injuries and neuropathies during surgery due to external ulnar nerve compression or stretching caused by malpositioning and improper or inadequate padding during surgery. Prevention of perioperative peripheral neuropathies to Mr. Barber, including his left upper extremity, was preventable by proper positioning and padding of his left arm and hand. Dr. Moss should have known that the proper technique and manner in which to position Mr. Barber's right and left upper extremities under the circumstances relating to the CABG procedure, including the harvesting of the left radial artery which were designed to prevent the development of a perioperative peripheral neuropathic injury to the patient and he should have employed such proper techniques. In that regard, Dr. Moss, with the cooperation of nurses Alexander and Syptak, should have positioned Mr. Barber's right and left upper extremities in a manner to decrease pressure on the postcondylar groove of the humerus or ulnar groove. When Mr. Barber's arms were tucked at the side the neutral forearm position with elbows padded would have been appropriate. When Mr. Barber's left upper extremity was abducted on an arm board, that extremity should have been either in supination or a neutral forearm position. His arm should have been extended to less than ninety degrees. Dr. Moss (either personally or with the cooperation of nurses Alexander and Syptak, acting pursuant to his orders and instructions) should have applied padding materials such as foam sponges, eggcrate foam or gel pads, to protect exposed peripheral nerves in Mr. Barber's left arm, particularly at the site of his elbow and left ulnar groove. Thus, after Mr. Barber's left radial artery was harvested from his left upper extremity which had been extended on an armboard for that purpose, Dr. Moss, and nurses Alexander and Syptak, should have assured that Mr. Barber's left upper extremity was returned to his side in a neutral forearm position and padding of his left elbow and any bony prominences should have been performed to protect his left ulnar nerve and prevent the risk of a left upper extremity neuropathy to the nerve. In accomplishing this, Dr. Moss should have either assisted with the positioning and padding of Mr.



Barber's left upper extremity following the harvest of his left radial artery or he should have provided such instructions to nurses Alexander and Syptak, Dr. Mercer and/or Ms. Barnett-Wright and he should have then visually inspected the area to make sure Mr. Barber had been positioned and padded appropriately. Also, Drs. Taurianinen, Dean, and Mercer, and Ms. Barnett-Wright, with the cooperation of Dr. Moss and nurses Alexander and Syptak, should have assured and followed procedures so that Mr. Barber's left upper extremity was positioned in a neutral forearm position and properly padded to prevent the risk that any of the surgeons or assistants could come in contact or lean on his left arm during the surgical procedure.

b.  It is my opinion that Dr. Moss failed to meet the applicable reasonable, prudent and accepted standards of medical care for him in that he did not properly and adequately perform procedures to assure that Mr. Barber's left upper extremity was positioned and padded to decrease pressure on his left postcondylar groove of the humerus or ulnar groove in order to protect him from a serious and permanent left ulnar nerve injury and neuropathy to his left upper extremity. During the surgery, Mr. Barber was asleep under the effects of general anesthesia and he was unable to care for himself and protect himself from a left upper extremity ulnar nerve injury and neuropathy. According to the hospital's intraoperative record, Mr. Barber's right arm was placed in a tucked and padded position on his right side, his left arm was placed on an olympic table for the left radial artery harvest procedure, and then his left arm was placed in a "tucked" position on his left side by Dr. Moss, with the cooperation of nurses Alexander and Syptak, following the left radial artery harvest procedure. However, Dr. Moss, with the cooperation of nurses Alexander and Syptak, improperly failed to position Mr. Barber's left arm and apply padding or adequate padding such as foam sponges, eggcrate foam, or gel pads to protect his exposed peripheral left ulnar nerve at the site of his elbow and left ulnar groove. Dr. Moss should have directed nurses Alexander and Syptak to place Mr. Barber's left arm in a neutral forearm position and apply padding of his left elbow to protect his left ulnar nerve, and Dr. Moss should have checked the site of Mr. Barber's left arm and elbow to assure that these procedures had been properly followed, or Dr Moss should have performed these procedures himself. It appears from the hospital record that Dr. Moss did not adequately direct nurses Alexander and Syptak in the positioning and placement of Mr. Barber's left arm to protect his left ulnar nerve following the left radial artery harvest, and that he did not adequately perform these procedures himself nor assure that nurses Alexander and Syptak had done so to protect Mr. Barber's left ulnar nerve, since these procedures were not performed. Nurses Alexander and Syptak failed to properly or adequately position

and pad Mr. Barber's left arm at the site of his left elbow and ulnar groove to protect his ulnar nerve from serious injury. These standard of care failures by Dr. Moss, and nurses Alexander and Syptak, very likely resulted in the exposure of Mr. Barber's left ulnar peripheral nerve to excessive external pressure or stretching, or both, over a prolonged period of approximately four hours during the surgical procedure and this prolonged pressure and/or stretching most likely resulted in a serious and permanent left ulnar nerve injury and neuropathy to Mr. Barber's left arm and hand, and Mr. Barber's physical impairments in the use of his left hand consisting of pain, numbness, stiffness, impaired use of his left hand and two fingers involved. My opinion in this regard is based upon the facts that Mr. Barber did not have any preoperative history of left upper extremity neuropathy, the hospital intraoperative records indicate that his left upper extremity was inappropriately and inadequately positioned and padded during the surgery, he awoke from general anesthesia in the ICU and immediately perceived painful throbbing, burning and swelling of his left arm and hand, and left hand numbness in the areas of his ring and small fingers and that side of his hand, he later underwent outpatient nerve conduction studies which revealed an ulnar nerve injury which did not respond to physical therapy and surgical therapy, and the pain, numbness, stiffness, and muscle deterioration in his left hand has persisted long past his discharge from the hospital in January 2004 and appears likely to be permanent. Although Mr. Barber's left arm neuropathy has improved with time, his left hand ulnar nerve injury and neuropathy has continued since the time of his surgery and is most likely permanent since he still experiences a neuropathy more than three years after his surgery. Also, Mr. Barber reports that he continues to experience numbness, atrophy, stiffness in his left hand, particularly his ring and small fingers, and resulting great difficulty in grasping with his left hand and using his left hand to perform his job duties as a insurance claims representative, including great writing difficulties. If Dr. Moss had provided proper management and supervision of the positioning and padding of Mr. Barber's left upper extremity during the CABG procedure, particularly during and following the harvest of his left radial artery in the manner set forth above; that is, if Dr. Moss either by himself or with the cooperation of nurses Alexander and Syptak, had properly positioned and padded Mr. Barber's left arm, and particularly the area of his left elbow and ulnar groove, his ulnar nerve would not have been exposed to prolonged pressure throughout the remainder of the surgery, and in all reasonable medical probability, he would not have suffered permanent left upper extremity ulnar nerve injury and neuropathy for the reasons which I have discussed above and he would have most likely avoided the physical pain and suffering and mental anguish, loss of earnings and/or earning capacity, physical impairment, and reasonable and necessary medical and healthcare expenses damages to him and his wife which resulted from this injury.

15.    In my opinion, the reasonable, prudent, and accepted standards of medical care applicable to Defendant Leo C. Mercer, Jr., M.D. (Dr. Mercer) under the same or similar circumstances involved in the care and treatment relating to the positioning and padding of Malcolm Barber's left upper extremity; the care and treatment rendered by Dr. Mercer for Mr. Barber which did not meet these standards in 2004; and the causal relationship between such failures and the injury, harm or damages of Mr. Barber, were as follows:

a.    Dr. Mercer should have also been aware of the need for proper positioning and padding during surgical procedures in order to prevent perioperative peripheral neuropathic injury. As a general surgeon during Mr. Barber's CABG procedure, Dr. Mercer was responsible for various aspects of the surgical procedure, including harvesting of Mr. Barber's left radial artery, as well as other aspects of the procedure. In that regard, Dr. Mercer should have been aware that Mr. Barber's body required specific positioning in order to accomplish various aspects of the surgical procedure and she should have possessed knowledge regarding the purpose(s) for various patient positioning techniques, any potential risks of peroperaitve peripheral neuropathic injury associated with certain positioning techniques, and techniques designed to allow for prevention of perioperative peripheral neuropathic injury to patients. Dr. Mercer should have known that his role as a general surgeon required that he had a responsibility for assuring that Mr. Barber was properly positioned and padded throughout his CBG procedure in appropriate manners utilizing proper techniques which should have been utilized during Mr. Barber's CABG procedure as discussed above and also set forth below with more particularity and he should have assured that such techniques were utilized by either performing those procedures himself or by assuring that they had been performed by either Dr. Moss, Nurse Alexander, Nurse Syptak or all of them.

Specifically, Dr. Mercer should have assured that Mr. Barber's left upper extremity was returned to his side in a neutral forearm position and padding of his left elbow and any bony prominences should have been performed to protect his left ulnar nerve and prevent the risk of a left upper extremity neuropathy to the nerve. Also, Dr. Mercer, with the cooperation of Dr. Moss, Ms. Barnett-Wright and nurses Alexander and Syptak, should have assured and followed procedures so that Mr. Barber's left upper extremity was positioned in a neutral forearm position and properly padded to prevent the risk that any of the surgeons or assistants could come in contact or lean on his left arm during the surgical procedure. Dr. Mercer should have visually inspected the positioning of Mr. Barber's left upper extremity following the harvest of his left radial artery in order to determine if his left arm was positioned in a neutral forearm position and that appropriate and adequate padding was utilized to protect his exposed left ulnar nerve at the site of his elbow and left ulnar groove since the hospital record reflects that this did not occur during Mr. Barber's CABG procedure, Dr. Mercer should have recognized



that Mr. Barber had not received proper positioning and padding following the harvest of his left radial artery and he should have either performed those procedures himself or he should have raised a concern to Dr. Moss of those matters and ordered that Mr. Barber be positioned and padded appropriately.

The applicable reasonable, prudent and accepted standards of care for Dr. Mercer required Dr. Mercer to properly position and pad Mr. Barber's left and right upper extremities before the start of the CABG surgical procedure, during the left radial artery harvest, after the left radial arterey harvest and during the remainder of the surgery in order to prevent peripheral neuorpathies to Mr. Barber's upper extremities. Of the major nerves in the upper extremities, the ulnar nerve and brachial plexus nerves are and were the most common nerves to be at risk of injury and to become symptomatic and lead to major disability of a patient during and after the perioperative period. Improper surgical patient positioning and padding of upper extremities were well known causative factors in the development of surgical patients' ulnar neuropathies as of 2004 and such risks had been known by the surgical, hospital, and operating room nursing communities in the United States for many years. As of 2004, reasonably prudent general surgeons were or should have been aware that surgical patients in supine positions were at risk of developing ulnar nerve injuries and neuropathies during surgery due to external ulnar nerve compression or stretching caused by malpositioning and improper or inadequate padding during surgery. Prevention of perioperative peripheral neuropathies to Mr. Barber, including his left upper extremity, was preventable by proper positioning and padding of his left arm and hand. After Dr. Mercer, with the assistance of Ms. Barnett-Wright, harvested Mr. Barber's left radial artery from his left upper extremity extended on an armboard, Dr. Mercer, together with Dr. Moss, and nurses Alexander and Syptak, should have assured that Mr. Barber's left upper extremity was returned to his side in a neutral forearm position and padding of his left elbow and any bony prominences should have been performed to protect his left ulnar nerve and prevent the risk of a left upper extremity neuropathy to the nerve. Also, Dr. Mercer and Ms. Barnett-Wright, with the cooperation of Dr. Moss and nurses Alexander and Syptak, should have assured and followed procedures so that Mr. Barber's left upper extremity was positioned in a neutral forearm position and properly padded to prevent the risk that any of the surgeons or assistants could come in contact or lean on his left arm during the surgical procedure.

b.  It is my opinion that Dr. Mercer failed to meet the applicable reasonable, prudent and accepted standards of medical care for him in that he did not properly and adequately perform procedures to assure that Mr. Barber's left upper extremity was positioned and padded to decrease pressure on his left postcondylar groove of the humerus or ulnar groove in order to

73

protect him from a serious and permanent left ulnar nerve injury and neuropathy to his left upper extremity. During the surgery, Mr. Barber was asleep under the effects of general anesthesia and he was unable to care for himself and protect himself from a left upper extremity ulnar nerve injury and neuropathy. According to the hospital's intraoperative record a left radial artery harvest was performed by Ms. Barnett-Wright, under the supervision of Dr. Taurianinen and Dr. Dean. After this harvest procedure, Mr. Barber's right arm was placed in a tucked and padded position on his right side, his left arm was placed on an olympic table for the left radial artery harvest procedure, and then his left arm was placed in a "tucked" position on his left side by Dr. Moss, with the cooperation of nurses Alexander and Syptak. Dr. Mercer, with the assistance of Ms. Barnett-Wright failed to with the anesthesiologist, Dr. Moss, and the nurses, Alexander and Syptak, to assure that Mr. Barber's left upper extremity was properly positioned and padded for the remainder of the CABG surgery. However, Dr. Mercer, with the assistance of Ms. Barnett-Wright, improperly failed to position Mr. Barber's left arm and apply padding or adequate padding such as foam sponges, eggcrate foam, or gel pads to protect his exposed peripheral left ulnar nerve at the site of his elbow and left ulnar groove. Dr. Mercer should have directed Ms. Barnett-Wright to place Mr. Barber's left arm in a neutral forearm position and apply padding of his left elbow to protect his left ulnar nerve, and Dr. Mercer should have checked the site of Mr. Barber's left arm and elbow to assure that these procedures had been properly followed, or Dr. Mercer should have performed these procedures themselves. It appears from the hospital record that Dr. Mercer did not adequately direct Ms. Barnett-Wright in the positioning and placement of Mr. Barber's left arm to protect his left ulnar nerve following the left radial artery harvest, and that they did not adequately perform these procedures themselves nor assure that Ms. Barnett-Wright had done so to protect Mr. Barber's left ulnar nerve. Ms. Barnett-Wright failed to properly or adequately position and pad Mr. Barber's left arm at the site of his left elbow and ulnar groove to protect his ulnar nerve from serious injury. These standard of care failures by Dr. Mercer, and Ms. Barnett-Wright, very likely resulted in the exposure of Mr. Barber's left ulnar peripheral nerve to excessive external pressure or stretching, or both, over a prolonged period of approximately four hours during the surgical procedure and this prolonged pressure and/or stretching most likely resulted in a serious and permanent left ulnar nerve injury and neuropathy to Mr. Barber's left arm and hand, and Mr. Barber's physical impairments in the use of his left hand consisting of pain, numbness, stiffness, impaired use of his left hand and two fingers involved. My opinion in this regard is based upon the facts that Mr. Barber did not have any preoperative history of left upper extremity neuropathy, the hospital intraoperative records indicate that his left upper extremity was inappropriately and inadequately positioned and padded during the surgery, he awoke from general anesthesia in the ICU and immediately perceived painful throbbing, burning and swelling of his left

arm and hand, and left hand numbness in the areas of his ring and small fingers and that side of his hand, he later underwent outpatient nerve conduction studies which revealed an ulnar nerve injury which did not respond to physical therapy and surgical therapy, and the pain, numbness, stiffness, and muscle deterioration in his left hand has persisted long past his discharge from the hospital in January 2004 and appears most likely to be permanent. Although Mr. Barber's left arm neuropathy has improved with time, his left hand ulnar nerve injury and neuropathy has continued since the time of his surgery and is likely permanent since he still experiences a neuropathy more than three years after his surgery. Also, Mr. Barber reports that he continues to experience numbness, atrophy, stiffness in his left hand, particularly his ring and small fingers, and resulting great difficulty in grasping with his left hand and using his left hand to perform his job duties, as a insurance claims representative, including great writing difficulties. If Dr. Mercer with the cooperation of Ms. Barnett-Wright, had properly positioned and padded Mr. Barber's left arm, and particularly the area of his left elbow and ulnar groove, his ulnar nerve would not have been exposed to prolonged pressure throughout the remainder of the surgery, and in all reasonable medical probability, he would not have suffered permanent left upper extremity ulnar nerve injury and neuropathy for the reasons which I have discussed above.

16.     In my opinion, the reasonable, prudent and accepted standards of physician assistant care applicable to Shellie Barnett-Wright, PA-C (Barnett-Wright) under the same or similar circumstances involved in the care and treatment relating to the positioning and padding of Malcolm Barber's left upper extremity; the care and treatment rendered by Ms. Barnett-Wright for Mr. Barber which did not meet these standards in 2004; and the causal relationship between such failures and the injury, harm or damages of Mr. Barber, were as follows:

a.     Ms. Barnett-Wright should have also been aware of the need for proper positioning and padding during surgical procedures in order to prevent perioperative peripheral neuropathic injury. As a physician assistant during Mr. Barber's CABG procedure, Ms. Barnett-Wright was responsible for assisting the surgeons, Dr. Taurianenian, Dr. Dean, and Dr. Mercer with various aspects of the surgical procedure, including harvesting of Mr. Barber's left radial artery, as well as other aspects of the procedure. In that regard, Ms. Barnett-Wright should have been aware that Mr. Barber's body required specific positioning in order to accomplish various aspects of the surgical procedure and she should have possessed knowledge regarding the purpose(s) for various patient positioning techniques, any potential risks of peroperaitve peripheral neuropathic injury associated with certain positioning techniques, and techniques designed to allow for prevention of perioperative peripheral neuropathic injury to patients. Ms. Barnett-Wright should have known that her role as a physician assistant required that she had a responsibility for assuring that Mr. Barber was properly positioned and

padded throughout his CBG procedure in appropriate manners utilizing proper techniques which should have been utilized during Mr. Barber's CABG procedure as discussed above and also set forth below with more particularity and she should have assured that such techniques were utilized by either performing those procedures herself or by assuring that they had been performed by either Dr. Moss, Nurse Alexander, Nurse Syptak or all of them.

Specifically, Ms. Barnett-Wright should have assured that Mr. Barber's left upper extremity was returned to his side in a neutral forearm position and padding of his left elbow and any bony prominences should have been performed to protect his left ulnar nerve and prevent the risk of a left upper extremity neuropathy to the nerve. Also, Ms. Barnett-Wright, with the cooperation of Dr. Moss and nurses Alexander and Syptak, should have assured and followed procedures so that Mr. Barber's left upper extremity was positioned in a neutral forearm position and properly padded to prevent the risk that any of the surgeons or assistants could come in contact or lean on his left arm during the surgical procedure. Ms. Barnett-Wright should have visually inspected the positioning of Mr. Barber's left upper extremity following the harvest of his left radial artery in order to determine if his left arm was positioned in a neutral forearm position and that appropriate and adequate padding was utilized to protect his exposed left ulnar nerve at the site of his elbow and left ulnar groove since the hospital record reflects that this did not occur during Mr. Barber's CABG procedure. Ms. Barnett-Wright should have recognized that Mr. Barber had not received proper positioning and padding following the harvest of his left radial artery and she should have either performed those procedures herself or she should have raised a concern to Dr. Moss of those matters and requested that Mr. Barber be positioned and padded appropriately.

b. It is my opinion that Ms. Barnett-Wright, failed to meet the applicable reasonable, prudent and accepted standards of physician assistant care for her in that she did not properly and adequately perform procedures to assure that Mr. Barber's left upper extremity was positioned and padded to decrease pressure on his left postcondylar groove of the humerus or ulnar groove in order to protect him from a serious and permanent left ulnar nerve injury and neuropathy to his left upper extremity. During the surgery, Mr. Barber was asleep under the effects of general anesthesia and he was unable to care for himself and protect himself from a left upper extremity ulnar nerve injury and neuropathy. According to the hospital's intraoperative record a left radial artery harvest was performed by Ms. Barnett-Wright, under the supervision of Dr. Taurianinen and Dr. Dean. After this harvest procedure, Mr. Barber's right arm was placed in a tucked and padded position on his right side, his left arm was placed on an olympic table for the left radial artery harvest procedure, and then his left arm was placed in a "tucked" position on his left side by Dr. Moss,



with the cooperation of nurses Alexander and Syptak. In assisting Dr. Taurianinen, Dr. Dean and Dr. Mercer, Ms. Barnett-Wright had a responsibility, along with the anesthesiologist, Dr. Moss, and the nurses, Alexander and Syptak, to assure that Mr. Barber's left upper extremity was properly positioned and padded for the remainder of the CABG surgery. However, in assisting Dr. Taurianinen, Dr. Dean and Dr. Mercer, Ms. Barnett-Wright, improperly failed to position Mr. Barber's left arm and apply padding or adequate padding such as foam sponges, eggcrate foam, or gel pads to protect his exposed peripheral left ulnar nerve at the site of his elbow and left ulnar groove. Ms. Barnett-Wright failed to place Mr. Barber's left arm in a neutral forearm position and apply padding of his left elbow to protect his left ulnar nerve. Ms. Barnett-Wright failed to properly or adequately position and pad Mr. Barber's left arm at the site of his left elbow and ulnar groove to protect his ulnar nerve from serious injury. These standard of care failures by Ms. Barnett-Wright very likely resulted in the exposure of Mr. Barber's left ulnar peripheral nerve to excessive external pressure or stretching, or both, over a prolonged period of approximately four hours during the surgical procedure and this prolonged pressure and/or stretching most likely resulted in a serious and permanent left ulnar nerve injury and neuropathy to Mr. Barber's left arm and hand, and Mr. Barber's physical impairments in the use of his left hand consisting of pain, numbness, stiffness, impaired use of his left hand and two fingers involved. My opinion in this regard is based upon the facts that Mr. Barber did not have any preoperative history of left upper extremity neuropathy, the hospital intraoperative records indicate that his left upper extremity was inappropriately and inadequately positioned and padded during the surgery, he awoke from general anesthesia in the ICU and immediately perceived painful throbbing, burning and swelling of his left arm and hand, and left hand numbness in the areas of his ring and small fingers and that side of his hand, he later underwent outpatient nerve conduction studies which revealed an ulnar nerve injury which did not respond to physical therapy and surgical therapy, and the pain, numbness, stiffness, and muscle deterioration in his left hand has persisted long past his discharge from the hospital in January 2004 and appears likely to be permanent. Although Mr. Barber's left arm neuropathy has improved with time, his left hand ulnar nerve injury and neuropathy has continued since the time of his surgery and is likely permanent since he still experiences a neuropathy more than three years after his surgery. Also, Mr. Barber reports that he continues to experience numbness, atrophy, stiffness in his left hand, particularly his ring and small fingers, and resulting great difficulty in grasping with his left hand and using his left hand to perform his job duties, as a insurance claims representative, including great writing difficulties. If Ms. Barnett-Wright, in cooperation with Dr. Taurianinen, Dr. Dean, and Dr. Mercer, had properly positioned and padded Mr. Barber's left arm, and particularly the area of his left elbow and ulnar groove, his ulnar nerve would not have been exposed to prolonged pressure throughout the remainder of



the surgery, and in all reasonable medical probability, he would not have suffered permanent left upper extremity ulnar nerve injury and neuropathy for the reasons which I have discussed above.

17.    In my opinion, the reasonable, prudent and accepted standards of hospital and hospital nursing care applicable to United Regional Health Care System, Inc. (URHCS), by and through its nursing employees, agents and/or servants, including W. Alexander, R.N. and S. Syptak, R.N. under the same or similar circumstances involved in the care and treatment relating to the positioning and padding of Malcolm Barber's left upper extremity; the care and treatment rendered by URHCS, by and through its nursing employees, agents and/or servants, including W. Alexander, R.N. and S. Syptak, R.N. for Mr. Barber which did not meet these standards in 2004; and the causal relationship between such failures and the injury, harm or damages of Mr. Barber, were as follows:

a.    URHCS, by and through its nursing employees, agents and/or servants, Nurse Alexander and Nurse Syptak, should have known that providing proper positioning and padding of the patient during surgical procedures was important in order to prevent a perioperative peripheral neuropathic injury. Additionally, Nurses Alexander and Syptak should have been generally aware of proper patient positioning and padding techniques utilized to prevent injury to the patient's extremities during surgical procedures, including CABG procedures and they should have been cognizant of their role in Mr. Barber's surgical procedure in providing positioning and padding to Mr. Barber during his CABG procedure. Nurses Alexander and Syptak should have also appreciated that although the anesthesiologist, Dr. Moss, was responsible for providing the overall management and supervision of the positioning and padding of Mr. Barber during his CABG procedure, that as nurses assisting with those aspects of Mr. Barber's CABG procedure, they each had an independent responsibility to know the proper positioning and padding techniques required during this type of procedure (as previously discussed and as discussed below in more particularity) and to assure that Mr. Barber received such proper positioning and padding throughout his CABG procedure.

The applicable reasonable, prudent and accepted standards of care for URHCS, by and through its nursing employees, agents and/or servants, including W. Alexander, R.N. and S. Syptak, R.N., required URHCS, by and through its nursing employees, agents and/or servants, including W. Alexander, R.N. and S. Syptak, R.N., to properly position and pad Mr. Barber's left and right upper extremities before the start of the CABG surgical procedure, during the left radial artery harvest, after the left radial arterey harvest and during the remainder of the surgery in order to prevent peripheral neuorpathies to Mr. Barber's upper extremities. Of the major nerves in the upper extremities, the ulnar nerve and brachial plexus nerves are and were the most common nerves to be at risk of injury and to become symptomatic and lead to major disability of a patient during

and after the perioperative period. Improper surgical patient positioning and padding of upper extremities were well known causative factors in the development of surgical patients' ulnar neuropathies as of 2004 and such risks had been known by the surgical, hospital, and operating room nursing communities in the United States for many years. As of 2004, reasonably prudent registered nurses were or should have been aware that surgical patients in supine positions were at risk of developing ulnar nerve injuries and neuropathies during surgery due to external ulnar nerve compression or stretching caused by malpositioning and improper or inadequate padding during surgery. Prevention of perioperative peripheral neuropathies to Mr. Barber, including his left upper extremity, was preventable by proper positioning and padding of his left arm and hand. Nurses Alexander and Syptak, should have ensured that Mr. Barber's right and left upper extremities were positioned in a manner to decrease pressure on the postcondylar groove of the humerus or ulnar groove. When his arms were tucked at the side the neutral forearm position with elbows padded would have been appropriate. When his left upper extremity was abducted on an arm board, that extremity should have been either in supination or a neutral forearm position. His arm should have been extended to less than ninety degrees. Nurses Alexander and Syptak should have applied padding materials such as foam sponges, eggcrate foam or gel pads, to protect exposed peripheral nerves in Mr. Barber's left arm, particularly at the site of his elbow and left ulnar groove. Thus, after Drs. Taurianinen, Dean, and Mercer, with the assistance of Ms. Barnett-Wright, harvested Mr. Barber's left radial artery from his left upper extremity extended on an armboard, Nurses Alexander and Syptak should have taken steps to ensure that Mr. Barber's left upper extremity was returned to his side in a neutral forearm position and padding of his left elbow and any bony prominences should have been performed to protect his left ulnar nerve and prevent the risk of a left upper extremity neuropathy to the nerve. Also, Nurses Alexander and Syptak should have taken steps to ensure that procedures were followed so that Mr. Barber's left upper extremity was positioned in a neutral forearm position and properly padded to prevent the risk that any of the surgeons or assistants could come in contact or lean on his left arm during the surgical procedure.

b.    It is my opinion that URHCS, by and through its nursing employees, agents, or servants, nurses Alexander and Syptak, failed to meet the applicable reasonable, prudent and accepted standards of nursing care in that they did not properly and adequately perform procedures to assure that Mr. Barber's left upper extremity was positioned and padded to decrease pressure on his left postcondylar groove of the humerus or ulnar groove in order to protect him from a serious and permanent left ulnar nerve injury and neuropathy to his left upper extremity. During the surgery, Mr. Barber was asleep under the effects of general anesthesia and he was unable to care for himself and protect himself from a left

upper extremity ulnar nerve injury and neuropathy. According to the hospital's intraoperative record, Mr. Barber's right arm was placed in a tucked and padded position on his right side, his left arm was placed on an olympic table for the left radial artery harvest procedure, and then his left arm was placed in a "tucked" position on his left side by Dr. Moss, with the cooperation of nurses Alexander and Syptak, following the left radial artery harvest procedure. However, in cooperation with Dr. Moss, Nurses Alexander and Syptak improperly failed to position Mr. Barber's left arm and apply padding or adequate padding such as foam sponges, eggcrate foam, or gel pads to protect his exposed peripheral left ulnar nerve at the site of his elbow and left ulnar groove. Nurses Alexander and Syptak should have placed Mr. Barber's left arm in a neutral forearm position and apply padding of his left elbow to protect his left ulnar nerve. It appears from the hospital record that Nurses Alexander and Syptak, in the positioning and placement of Mr. Barber's left arm, failed to protect his left ulnar nerve following the left radial artery harvest. Nurses Alexander and Syptak failed to properly or adequately position and pad Mr. Barber's left arm at the site of his left elbow and ulnar groove to protect his ulnar nerve from serious injury. These standard of care failures by Nurses Alexander and Syptak very likely resulted in the exposure of Mr. Barber's left ulnar peripheral nerve to excessive external pressure or stretching, or both, over a prolonged period of approximately four hours during the surgical procedure and this prolonged pressure and/or stretching most likely resulted in a serious and permanent left ulnar nerve injury and neuropathy to Mr. Barber's left arm and hand, and Mr. Barber's physical impairments in the use of his left hand consisting of pain, numbness, stiffness, impaired use of his left hand and two fingers involved. My opinion in this regard is based upon the facts that Mr. Barber did not have any preoperative history of left upper extremity neuropathy, the hospital intraoperative records indicate that his left upper extremity was inappropriately and inadequately positioned and padded during the surgery, he awoke from general anesthesia in the ICU and immediately perceived painful throbbing, burning and swelling of his left arm and hand, and left hand numbness in the areas of his ring and small fingers and that side of his hand, he later underwent outpatient nerve conduction studies which revealed an ulnar nerve injury which did not respond to physical therapy and surgical therapy, and the pain, numbness, stiffness, and muscle deterioration in his left hand has persisted long past his discharge from the hospital in January 2004 and appears likely to be permanent. Although Mr. Barber's left arm neuropathy has improved with time, his left hand ulnar nerve injury and neuropathy has continued since the time of his surgery and is likely permanent since he still experiences a neuropathy more than three years after his surgery. Also, Mr. Barber reports that he continues to experience numbness, atrophy, stiffness in his left hand, particularly his ring and small fingers, and resulting great difficulty in grasping with his left hand and using his left hand to perform his job duties as a insurance

claims representative, including great writing difficulties. If Nurses Alexander and Syptek, in cooperation with Dr. Moss, had properly positioned and padded Mr. Barber's left arm, and particularly the area of his left elbow and ulnar groove, his ulnar nerve would not have been exposed to prolonged pressure throughout the remainder of the surgery, and in all reasonable medical probability, he would not have suffered permanent left upper extremity ulnar nerve injury and neuropathy for the reasons which I have discussed above.

18. It is my understanding that my report sets forth my qualifications, observations, findings and opinions relating to the standards of medical care, physician assistant care, and nursing care, causation and damages issues in the above numbered and styled civil case as of the date of this report. I reserve the right to modify or augment any of my observations, findings and opinions expressed in this report to conform with any additional or other evidence which may be developed and brought to my attention in the future.

19. It is my understanding that my expert report will be served on the attorneys representing the applicable defendants in the above-numbered and styled civil case under Texas Civil Practice and Remedies Code, Sections 74.351 and 74.401.


JEFFREY ALAN WAGNER, M.D., M.B.A.

9-28-07

DATE SIGNED

# EXHIBIT "A"

# Jeffrey Alan Wagner MD, MBA
## Managing Partner
### Milford Anesthesia Associates, PC
www.milfordanesthesia.com

*Diplomate & Consultant*, American Board of Anesthesia          April 1985
*Diplomate*, National Board of Medical Examiners          July 1982
*Instructor*. Advanced Cardiac Life Support; American Heart Association

## Employment & Appointments
June 1986-present

> *President and Managing Partner*, Anesthesia Associates, Milford, CT
> Duties include solicitation and completion of a wide variety of projects encompassing all aspects of inpatient and office based anesthesia and surgical practice. A consultative chronology is available.

July 1984 – December 2003

> *Chairperson*, Department of Anesthesia; Director of Ambulatory Surgery Center, Milford Hospital, Milford, CT
> Duties include management of all aspects of departmental operations as well as service on various Hospital panels and committees including *Quality Assurance, Intensive Care,* and *Medical Executive.*

January 2002- June 2003

> *Faculty*, Dept. of Anesthesia, Yale School of Medicine, New Haven, CT

July 1996 – December 1998

> *CEO*, Pain Therapy Consultants, Farmington, CT
> Duties included the day-to-day management of a large multi-disciplinary pain practice based in Farmington CT.

July 1986 – June 1988

> *Director*, Intensive Care Unit, Milford Hospital, Milford, CT

January 1983- June 1985

> *Assistant Professor of Anesthesia; Clinical Scholar, Attending Anesthesiologist.* Department of Anesthesia, Yale School of Medicine, Yale New Haven Hospital, New Haven, CT

## Education
| | |
|---|---|
| *MBA*; University of South Florida, Tampa, FL | 1996-1997 |
| *Anesthesia Residency*; Yale New Haven Hospital, New Haven, CT | 1980-1982 |
| *MD*; Michigan State University, East Lansing, MI | 1976-1979 |
| *B.A. Biology*; S.U.N.Y. at Buffalo, Buffalo, NY | 1972-1975 |

*Phi Beta Kappa, Magna Cum Laude; Regents Scholar*



EXHIBIT E

83

# Consulting Chronology

BARD USCI, Billerica, MA — 1983-84
*Consultant in Product Development and Marketing*

Consultant, New Haven County Medical Association — 1985-90
*Claims Review Sub Panel*

Park City Hospital, Bridgeport, CT; Bruce Markowitz, CEO — 1987-88
*Anesthesia Services Development*

New Milford Hospital, New Milford, CT; Richard Pugh, CEO — 1988-89
*Anesthesia Services Development*

Johnson Memorial Hospital, Stafford Springs, CT; Al Lerz, President — 1989-92
*Quality Assurance Review and Anesthesia Department Oversight*

Winsted Hospital, Winsted, CT; Mike Baxa, CEO — 1991-92
*Anesthesia Services Development*

Sharon Hospital, Sharon, CT; James Sok, CEO — 1991-93
*Anesthesia Services Development*

Windham Hospital, Willimantic, CT; Fred Hyde MD, CEO — 1994
*Quality Assurance Overview*

St. Luke's Hospital, New Bedford, MA; Barbara Wetherford, VP — 1994
*Anesthesia Department Review and Quality Analysis*

New Haven Foot Surgery Center; Milford, CT; Martin Pressman DPM, Director — 1995-
*Anesthesia Services Development and State Licensing Assistance; Ongoing
Anesthesia Coverage*

Medically Directed Incorporated, Washington, DC — 1997
*Case Review*

Constitution Eye Surgery Center LLC, Newington, CT; Kris Mineau, Director — 1997-
*Anesthesia Services Development and State Licensing Assistance; Ongoing
Anesthesia Coverage*

Johnson Memorial Hospital, Stafford Springs CT; Al Lerz, President — 1998-99
*Administrative Assistant for Surgical Services; Interim VP Medical Affairs*

Mercy Hospital, Springfield, MA; Herbert DiMeola MD, VPMA — 1998
*Assisted in restructuring anesthesia department to improve its fiscal performance*

Aesthetic Center of Milford, Milford, CT; Paul Fischer MD, Director — 1999
*Spearheaded development and implementation of multi-faceted aesthetic surgical
practice combining resources of private physicians, hospital, and ancillary personnel.*

44

## Consulting Chronology (continued)

Center for Advanced Reproductive Medicine, Norwalk, CT; M. Doyle MD, Director     2000
  *Anesthesia Services Design and Development*

Opticare, Waterbury CT, Nancy Noll, Administrative Director     2001-
  *Anesthesia Coverage*

Milford Eye Surgery Center, Milford CT; Kris Mineau, Director     2002-
  *Anesthesia Services Development & Coverage*

Bristol Hospital, Bristol CT; Thomas Kennedy III, President     2002-
  *Anesthesia Services Development & Coverage*

Yale School of Medicine Dept. Of Anesthesiology, Dr. Roberta Hines, Chair     2002-3
  *Anesthesia Service Contract for YPH*

Bradley Memorial Hospital, Southington CT; Clarence Silvia, President     2003
  *Anesthesia Services Development & Coverage*

West Haven VA Medical Center, West Haven CT; Paul Mulinski, VP     2005-
  *Anesthesia Services Contract*