

# COURT OF APPEALS

### SECOND DISTRICT OF TEXAS
### FORT WORTH

---

## NO. 2-09-288-CV

---

PRESBYTERIAN COMMUNITY HOSPITAL                    APPELLANTS
OF DENTON D/B/A PRESBYTERIAN
HOSPITAL OF DENTON AND CHAD
HAMMONDS, R.N.

V.

CONNIE SMITH, INDIVIDUALLY AND                     APPELLEES
AS PERSONAL REPRESENTATIVE OF
THE ESTATE OF THOMAS EDWARD
SMITH, DECEASED, AND AS NEXT
FRIEND FOR THOMAS ANTHONY
SMITH, A MINOR, AND DOUGLAS
SMITH AND STEPHANIE SMITH

------------

### FROM THE 393RD DISTRICT COURT OF DENTON COUNTY

------------

## OPINION

------------

### I. Introduction

In this interlocutory appeal, Appellants Presbyterian Hospital of Denton d/b/a

Presbyterian Hospital of Denton and Chad Hammonds, R.N. (collectively, the

Hospital) argue that the trial court abused its discretion by denying the Hospital's motion to dismiss. We affirm the trial court's order.

## II. Procedural Background

Appellees Connie Smith, Individually, and as Personal Representative of the Estate of Thomas Edward Smith, Deceased, and as Next Friend for Thomas Anthony Smith, a Minor, and Douglas and Stephanie Smith (collectively, the Smiths) sued the Hospital on September 2, 2008. The Smiths asserted that the Hospital, by and through its nurse-employees, acted negligently in its care and treatment of Thomas Edward Smith. On December 31, 2008, the Smiths served the Hospital with expert reports by Dr. Michael E. Halkos, a cardiothoracic surgeon, and Dean W. Hayman, R.N., a registered nurse specializing in cardiac and critical care nursing. The Hospital filed a motion to dismiss and argued Dr. Halkos's and Nurse Hayman's expert reports do not meet the statutory requirements because they do not constitute "an objective good faith effort to provide a fair summary of the alleged experts' opinions on the standard of care, alleged breach thereof, and how any alleged breach by [the Hospital] caused [the Smiths'] damages."

After a hearing, the trial court denied the Hospital's motion as to Dr. Halkos's report. The trial court partially denied and partially granted the Hospital's motion as to Nurse Hayman's report and granted the Smiths an extension to supplement Nurse

2

Hayman's report if they chose to do so.[1] The Smiths then served the Hospital with a supplemental report from Nurse Hayman, and the Hospital again objected. After a hearing, the trial court overruled the Hospital's objections to the supplemental report. This interlocutory appeal followed. *See* Tex. Civ. Prac. & Rem. Code Ann. § 51.014(a)(9) (Vernon 2008); *Lewis v. Funderburk*, 253 S.W.3d 204, 208 (Tex. 2008) (authorizing appeal from trial court order determining that expert report was adequate and denying motion to dismiss).

## III. Factual Background

The Smiths' fourth amended petition, their live pleading at the time of the second hearing on the Hospital's motion to dismiss, contains the following allegations relevant to their claims against the Hospital.

On June 21, 2006, Mr. Smith presented to the emergency department at the Hospital with intermittent headaches, feverishness, increasing malaise and shortness of breath, minimal cough, shoulder and back pain, and leg swelling. He was admitted to the Hospital for further evaluation and treatment. Tests revealed "the presence of bilateral pneumonia and moderate renal compromise" and "severe tricuspid regurgitation with vegetations present." Mr. Smith's blood cultures were

---

[1] The trial court stated, "While [Nurse Hayman's report] was deficient in part, I find that the Halkos report was sufficient to create a basis for asserting a claim that fairly put the Hospital on notice of the type of claims that are being asserted against it by and through the nurses." The trial court also stated that its partial grant of the Hospital's objection to Nurse Hayman's report is "kind of irrelevant because I find that it's [otherwise] sufficient."

also positive for methicillin-sensitive Staphylococcus aureus, and he was treated with intravenous antibiotics.

Because of his diagnosis of tricuspid valve endocarditis, Mr. Smith "underwent a tricuspid valve debridement and excision with tricuspid valve replacement" on June 30, 2006. A transesophageal echocardiogram at the end of the operative procedure "revealed good seating of the valve with no evidence of perivalvular leak, good function of the valve leaflets and . . . no evidence of an atrial-ventricular block." Mr. Smith then returned to the intensive care unit (the ICU) for further treatment and recovery.

On July 4, 2006, Mr. Smith had a Quinton catheter sutured into place in his left internal jugular vein. He tolerated the procedure well, and all catheters in his body were "noted to be free of reddness [sic] or edema." However, Nurse Hammonds entered Mr. Smith's room on July 5, 2006, and found that Mr. Smith "was experiencing agonal respirations," that "the Quintan [sic] catheter was no longer in its proper place," and that Mr. Smith "was and had been experiencing significant bleeding." The medical staff successfully resuscitated Mr. Smith, and he remained in the ICU. Later that day, however, Mr. Smith "was medically assessed that he was not able to follow simple commands, except to open his eyes when his name was called."

Over the next few days, Mr. Smith continued receiving blood pressure medications and received a new Quinton catheter. He received dialysis therapy, but

4

by July 8, 2006, his "blood pressure continued to drop despite increasing . . . his blood pressure medications" and other treatments. Mr. Smith also had "continuous oozing of blood from his mouth, nose, hemodialysis catheter, and scrotal area." On July 9, 2006, Dr. Mario Ruiz informed Mr. Smith's wife, Connie, that Mr. Smith was "slowly dying." On July 10, 2006, "a medical decision was made to withdraw life support measures from Mr. Smith due to his severely [sic] brain damaged [sic] and other conditions, such life support measures were withdrawn from Mr. Smith, and he was pronounced dead" on the evening of July 10, 2006. An autopsy by Dr. Juan Zamora "revealed pathological findings of a status post recent tricuspid valve prosthesis implant showing no complications, hypertrophy of the heart (500g) with organizing fibrinoid percarditis, bilateral granulomata of the lungs, edema of the brain with acute hepatitis, and other findings."

### IV. Standard of Review

A trial court's ruling concerning an expert report under section 74.351 (formerly article 4590i, section 13.01) of the Medical Liability and Insurance Act is reviewable under the abuse of discretion standard. *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.351; *Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002); *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 875 (Tex. 2001). To determine whether a trial court abused its discretion, we must decide whether the trial court acted without reference to any guiding rules or principles; in other words, we must decide whether the act was arbitrary or unreasonable. *Cire*

*v. Cummings*, 134 S.W.3d 835, 838–39 (Tex. 2004). An appellate court cannot conclude that a trial court abused its discretion merely because the appellate court would have ruled differently in the same circumstances. *Bowie Mem'l*, 79 S.W.3d at 52; *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 558 (Tex. 1995).

## V. Statutory Requirements

A health care liability claimant must serve an expert report on each defendant no later than the 120th day after the claim is filed. *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.351(a). A defendant may challenge the adequacy of a report by filing a motion to dismiss, and the trial court must grant the motion to dismiss if it finds, after a hearing, that "the report does not represent an objective good faith effort to comply with the definition of an expert report" in the statute. *Id*. § 74.351(*l*). While the expert report "need not marshal all of the plaintiff's proof," it must provide a fair summary of the expert's opinions as to the "applicable standard of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed." *Id*. § 74.351(r)(6); *Palacios*, 46 S.W.3d at 878 (construing former article 4590i, § 13.01).

To constitute a good faith effort, the report must discuss the standards of care, breach, and causation with sufficient specificity (1) to inform the defendant of the conduct the plaintiff has called into question and (2) to provide the trial court with a

6

basis to conclude that the claims have merit. *See Bowie Mem'l*, 79 S.W.3d at 52; *Palacios*, 46 S.W.3d at 879. A report does not fulfill this requirement if it merely states the expert's conclusions or if it omits any of the statutory requirements. *Bowie Mem'l*, 79 S.W.3d at 52; *Palacios*, 46 S.W.3d at 879. But the information in the report "does not have to meet the same requirements as the evidence offered in a summary-judgment proceeding or at trial." *Palacios*, 46 S.W.3d at 879.

When reviewing the adequacy of a report, the only information relevant to the inquiry is the information contained within the four corners of the document. *Bowie Mem'l*, 79 S.W.3d at 52; *Palacios*, 46 S.W.3d at 878. This requirement precludes a court from filling gaps in a report by drawing inferences or guessing as to what the expert likely meant or intended. *See Austin Heart, P.A. v. Webb*, 228 S.W.3d 276, 279 (Tex. App.—Austin 2007, no pet.). However, section 74.351 does not prohibit experts, as opposed to courts, from making inferences based on medical history. *Marvin v. Fithian*, No. 14-07-00996-CV, 2008 WL 2579824, at *4 (Tex. App.—Houston [14th Dist.] July 1, 2008, no pet.) (mem. op.); *see also* Tex. R. Evid. 703 (providing that an expert may draw inferences from the facts or data in a particular case); Tex. R. Evid. 705 (providing that expert may testify in terms of opinions and inferences).

## VI. Analysis

The Hospital argues in its sole issue that the expert reports by Dr. Halkos and Nurse Hayman are insufficient and that the trial court abused its discretion by

7

denying the Hospital's motion to dismiss. *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.351(*l*). Dr. Halkos's and Nurse Hayman's expert reports discuss the acts and omissions of three of the Hospital's nurse-employees: Donna L. McElravy, R.N.; Chad Hammonds, R.N.; and Garland Gill, R.N. We address the allegations against each of these nurse-employees in turn.

## A. Duty and Alleged Breach by Nurse McElravy

The Hospital contends Dr. Halkos's report is insufficient because it does not adequately describe the standard of care applicable to Nurse McElravy or how Nurse McElravy allegedly breached the standard of care.

Relevant portions of Dr. Halkos's report provide:

McElravy was responsible for assisting Dr. Bolton in managing the post-operative anticoagulation therapy of Mr. Smith to prevent thrombus formation as a result of the mechanical valve replacement surgery performed on the patient. At that time, the incidence of thrombus (blood clot) complications of following mechanical valve replacement surgery was or should have been a matter of common knowledge to reasonably prudent registered nurses specializing in cardiovascular and thoracic surgery.

McElravy should have properly monitored anticoagulant therapy for Mr. Smith in a manner that would maintain an INR (International Normalized Ratio) of 2.5 to 3.5; or a PTT (Partial Thromboplastin Time) of 1.5 to 2.5 times the control. . . . On the morning of July 4, 2006, at about 9:00 a.m., Dr. Bolton noted an INR greater than 3 in Mr. Smith, and recorded in the progress notes that Mr. Smith's INR was greater than 3 and noted to hold the administration of coumadin that night. [The Hospital] laboratory reported critically abnormal results of Mr. Smith's PT (protime) at about 9:34 a.m., as being greater than 120 seconds[,] and the laboratory was unable to calculate the INR. The protime greater than 120 seconds value reflected an excessive and potentially dangerous state of anticoagulation in Mr. Smith's blood.

8

When the critically abnormal PT results and lack of a calculable INR were reported, McElravy should have become aware of this information, and reported such values to Dr. Bolton, Dr. Russell, or PA Dizney and cause repeat testing of a new blood specimen from Mr. Smith to verify the previously noted and reported critical results. . . . Therefore, when McElravy discovered or should have discovered that Dr. Bolton improperly recorded Mr. Smith's INR as greater than 3, she failed to meet the applicable standard of reasonable and prudent nursing care in that she failed to bring to Dr. Bolton or PA Dizney's attention Dr. Bolton's improper assessment of Mr. Smith's INR on the morning of July 4, 2006[;] she also failed to meet the standard of reasonable nursing care in failing to recognize Mr. Smith's excessive anticoagulation blood condition, report such condition to Dr. Bolton, Dr. Russell or PA Dizney and bring about appropriate intervention to correct this dangerous condition for Mr. Smith.

Dr. Halkos's report adequately describes Nurse McElravy's duties and alleged breaches of those duties. The report states that McElravy: (1) had a duty to assist Dr. Bolton with Mr. Smith's post-operative anticoagulation therapy; (2) should have known the incidence of thrombus following mechanical valve replacement surgery; (3) should have monitored Mr. Smith's anticoagulant therapy so as to maintain an INR of 2.5 to 3.5 or a PTT of 1.5 to 2.5 times the control; (4) should have known Dr. Bolton incorrectly recorded the INR as greater than 3; (5) failed to report Dr. Bolton's incorrect assessment of Mr. Smith's INR; and (6) failed to recognize or report Mr. Smith's excessive anticoagulation blood condition to Dr. Bolton, Dr. Russell, or PA Dizney. These statements, all contained within the four corners of Dr. Halkos's report, are sufficient to inform the Hospital of the specific conduct by Nurse McElravy that the Smiths have called into question and provide a basis for the trial court to

9

conclude that the Smiths' claim has merit. *See Bowie Mem'l Hosp.*, 79 S.W.3d at 52; *Palacios*, 46 S.W.3d at 879.

The Hospital also argues that several individual statements in Dr. Halkos's report are insufficient.[2] We do not address these specific arguments by the Hospital, however, because Dr. Halkos's report, as a whole, provides a "fair summary" of his opinions; it (1) sufficiently informs the Hospital of the conduct the Smiths question and (2) provides the trial court with a basis to conclude the Smiths' claim has merit. *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.351(r)(6); *Bowie Mem'l*, 79 S.W.3d at 52; *Palacios*, 46 S.W.3d at 879; *Benavides v. Garcia*, 278 S.W.3d 794, 799 (Tex. App.—San Antonio 2009, pet. denied) (stating that opinion in expert report, read in isolation, appeared conclusory, but holding that opinion was sufficiently described in context of entire report). The trial court did not abuse its discretion by finding that Dr. Halkos's report adequately address Nurse McElravy's alleged duties and breaches of those duties.

## B. Duty and Alleged Breach by Nurse Hammonds

The Hospital also contends Nurse Hayman's report and supplemental report are insufficient because they do not adequately describe the standard of care

---

[2] For example, the Hospital argues Dr. Halkos's report states that Nurse McElravy "should have properly monitored anticoagulant therapy for Mr. Smith" but does not explain how Nurse McElravy improperly monitored anticoagulant therapy or how Nurse McElravy should have monitored it and does not state how McElravy was negligent in not having information about "critically abnormal PT . . . results and lack of calculable INR" as alleged in the report.

applicable to Nurse Hammonds or how Nurse Hammonds allegedly breached the standard of care.

Relevant portions of Nurse Hayman's report provide:

Nurse Hammonds was responsible for providing reasonable and prudent nursing diagnosis, assessment, care and treatment for Mr. Smith's post-operative conditions and well-being in the [Hospital] ICU, and this responsibility included careful and frequent monitoring of his physical and mental conditions, the plan of care from multiple consultants, and the delivery of ongoing intensive nursing care in the ICU and interventions as prescribed by attending and consulting physicians as well as reasonable nursing practices.

Nurse Hammonds administered 4 mg of morphine sulfate by IV and 15 mg of hydrocodone by mouth at 2000 (8:00 PM) on 7/04/06. Nurse Hammonds failed to properly administer the PRN (as necessary) pain control orders because he should have known that both medications should not have been administered to Mr. Smith in one dose. If Nurse Hammonds believed such orders allowed the choice to administer both medications at one time, then Hammonds failed to question or clarify Dr. Bolton's orders. It was a violation of the reasonable and prudent standards of nursing care for a critical care nurse to administer the medications in that manner or not to call Dr. Bolton and question the orders.

Nurse Hammonds failed to perform sufficient surveillance to discover the removal of the IJ catheter in time to prevent Mr. Smith's hemorrhagic arrest. A reasonably prudent critical care nurse . . . should have known that continuous bleeding for approximately 30–45 minutes would lead to hemorrhagic cardiac arrest. Therefore, it is reasonable to conclude, in reasonable nursing probability, that Defendant Hammonds failed to see and assess Mr. Smith for at least 30 minutes prior to his arrest. According to the hospital records, Hammonds recorded Mr. Smith's vital signs at a time prior to his arrest when the Quinton catheter must have been out and therefore significant bleeding would and should have been obvious to a critical care nurse, including Hammonds, performing duties according to the standards for reasonable and prudent nurses in ICU settings. The hospital ICU records indicate that Hammonds either failed to properly observe Mr.

11

Smith, or he did not accurately and completely record his nursing actions in the hospital record, and both such failures would be a violation of the applicable standard of nursing care for Hammonds.

Nurse Hammonds failed to set alarm limits on the physiologic monitors that reflected the patient's baseline vital signs and thereby failed to discover when various parameters were in alarm condition. . . . Hammonds either failed to transduce the IJ catheter to the alarm system or he failed to respond to the alarm condition caused by the removal of the device. In either situation, Hammonds failed to meet the applicable standard of nursing care for Mr. Smith. . . . In violation of the standards for reasonable and prudent critical care nursing, Nurse Hammonds failed to document alarm conditions, rhythm strips, oxygen de-saturation or his nursing responses to any of the abnormalities that occurred before Mr. Smith exsanguinated (bled out) into arrest.

The hospital code record reflects that ECG monitoring and pulse oximetry were in progress at the time of the arrest event. Defendant Hammonds either failed to establish that monitoring or he ignored the alarm conditions that would have occurred in the setting of "agonal breathing." Mr. Smith's agonal breathing would have caused alarm conditions in the rate of respirations and oxygen saturation on the alarm system. . . . Defendant Hammonds failed to recognize, intervene in, or document and report any such alarm conditions for Mr. Smith at that time. Further, Hammonds had an obligation to be in audible or visual proximity to promptly and adequately respond to any such clinical or physiological alarm conditions.

Using the physiologic monitoring system, Nurse Hammonds should have established and monitored clinical alarms/limits based on [Mr. Smith's] condition . . . . All central venous lines or catheters, like the left internal jugular catheter, should have been transduced to the physiological monitoring system such that the monitoring system would alarm when a central line became disconnected.

Defendant Hammonds failed to perform sufficient surveillance to discover the removal of the IJ catheter in time to prevent Mr. Smith's hemorrhagic arrest. A reasonably prudent critical care nurse, would have known that continuous bleeding for approximately 30–45 minutes would lead to hemorrhagic cardiac arrest. Therefore, in reasonable

12

> medical probability, Hammonds failed to observe Mr. Smith for 30–45 minutes prior to the arrest event.

In addition, Nurse Hayman's supplemental report provides that the standard of care applicable to Nurse Hammonds requires him to have basic knowledge of all medications he administers to a patient, including the potential side effect of the medications to assess, from a nursing perspective, "decreased levels of consciousness, disorientation, and/or sedation in patients" similar to Mr. Smith, and to "utilize wrist restraints in the care of patients, including Mr. Smith, who demonstrate a decreased level of consciousness, disorientation, and/or sedation in order to prevent the patient from causing injury to himself." Nurse Hayman's supplemental report states that Nurse Hammonds failed to appreciate the potential side effects of simultaneous doses of morphine sulphate and hydrocodone, failed to assess, from a nursing perspective, Mr. Smith's resulting neurological impairment and decreased levels of consciousness, disorientation, and/or sedation, and failed to utilize wrist restraints to prevent Mr. Smith from causing injury to himself.

Nurse Hayman's report and supplemental report provide that Nurse Hammonds: (1) had a duty to monitor Mr. Smith's post-operative mental and physical conditions; (2) had a duty to either question or clarify Dr. Bolton's order before administering both morphine and hydrocodone to Mr. Smith but failed to do either; (3) failed to assess, from a nursing perspective, or appreciate Mr. Smith's altered level of consciousness; (4) failed to use bilateral soft wrist restraints or obtain orders from Dr. Bolton or Dr. Russell for wrist restraints; (5) failed to provide

13

sufficient observations and surveillance of Mr. Smith; (6) failed to recognize that Mr. Smith's Quinton catheter had been removed while recording Mr. Smith's vital signs; (7) failed to timely discover the removal of Mr. Smith's Quinton catheter; and (8) either failed to establish a physiologic monitoring system and set the appropriate alarm limits on the monitoring system or failed to monitor and document the alarms from the monitoring system.  These statements, all contained within the four corners of Nurse Hayman's report, are sufficient to inform the Hospital of the specific conduct by Nurse Hammonds that the Smiths have called into question and provide a basis for the trial court to conclude that the claim has merit.  *See Bowie Mem'l*, 79 S.W.3d at 52; *Palacios*, 46 S.W.3d at 879.  The trial court did not abuse its discretion in finding that Nurse Hayman's report and supplemental report sufficiently address duty and alleged breach of duty as to Nurse Hammonds.

## C.    Duty and Alleged Breach by Nurse Gill

The Hospital next contends Nurse Hayman's report and supplemental report are insufficient because they do not adequately describe the standard of care applicable to Nurse Gill or how Nurse Gill allegedly breached the standard of care.

Relevant portions of Nurse Hayman's report provide:

> Nurse Gill was responsible for providing reasonable and prudent nursing diagnosis, assessment, care and treatment for Mr. Smith's post-operative conditions and well-being in the [Hospital] ICU, and this responsibility included careful and frequent monitoring of his physical and mental conditions, the plan of care from multiple consultants, and the delivery of ongoing intensive nursing care in the ICU and

14

interventions as prescribed by attending and consulting physicians as well as reasonable nursing practices.

Nurse Gill failed to perform sufficient surveillance to discover the removal of the IJ catheter in time to prevent Mr. Smith's hemorrhagic arrest. A reasonably prudent critical care nurse, should have known that continuous bleeding for approximately 30–45 minutes would lead to hemorrhagic cardiac arrest. Therefore, it is reasonable to conclude, in reasonable nursing probability, that Defendant Gill failed to see and assess Mr. Smith for at least 30 minutes prior to his arrest. The hospital ICU records indicate that Gill either failed to properly observe Mr. Smith, or he did not accurately and completely record his nursing actions in the hospital record, and both such failures would be a violation of the applicable standard of nursing care for Gill.

Defendant Gill failed to recognize, intervene in, or document and report any such alarm conditions for Mr. Smith at that time. Further, Gill had an obligation to be in audible or visual proximity to promptly and adequately respond to any such clinical or physiological alarm conditions.

Using the physiologic monitoring system, Nurse Gill should have established and monitored clinical alarms/limits based on [Mr. Smith's] condition . . . . All central venous lines or catheters, like the left internal jugular catheter, should have been transduced to the physiological monitoring system such that the monitoring system would alarm when a central line became disconnected.

Furthermore, Nurse Hayman's supplemental report states that the standard of care applicable to Nurse Gill requires him to have basic knowledge of all medications he administers to a patient, including the potential side effect of the medications to assess, from a nursing perspective, "decreased levels of consciousness, disorientation, and/or sedation in patients" similar to Mr. Smith, and to "utilize wrist restraints in the care of patients, including Mr. Smith, who demonstrate a decreased level of consciousness, disorientation, and/or sedation in order to prevent the patient

15

from causing injury to him[self]." Nurse Hayman's supplemental report states that Nurse Gill failed to appreciate the potential side effects of simultaneous doses of morphine sulphate and hydrocodone, failed to assess, from a nursing perspective, Mr. Smith's resulting neurological impairment and decreased levels of consciousness, disorientation, and/or sedation, and failed to utilize wrist restraints to prevent Mr. Smith from causing injury to himself.

Nurse Hayman's report and supplemental report adequately describe Nurse Gill's duties and alleged breaches of those duties. The report and supplemental report provide that Nurse Gill: (1) had a duty to monitor Mr. Smith's post-operative mental and physical conditions; (2) failed to, from a nursing perspective, assess or appreciate Mr. Smith's altered level of consciousness; (3) failed to use bilateral soft wrist restraints or obtain orders from Dr. Bolton or Dr. Russell for wrist restraints; (4) failed to provide sufficient surveillance of Mr. Smith; (5) failed to timely discover the removal of Mr. Smith's Quinton catheter; and (6) failed to establish or monitor and document a physiologic monitoring system with the appropriate alarm limits. These statements, all contained within the four corners of Nurse Hayman's reports, are sufficient to inform the Hospital of the specific conduct by Nurse Gill that the Smiths have called into question and provide a basis for the trial court to conclude that the Smiths' claim has merit. *See Bowie Mem'l*, 79 S.W.3d at 52; *Palacios*, 46 S.W.3d at 879. The trial court acted within its discretion in finding that Nurse Hayman's

16

report and supplemental report sufficiently address duty and alleged breach of duty as to Nurse Gill.

**D. Causation**

Finally, the Hospital argues the Smiths' expert reports are insufficient because they do not sufficiently describe how the alleged breaches of the standard of care by the Hospital's three nurse-employees caused any harm to Mr. Smith.

Relevant portions of Dr. Halkos's report provide:

It is my opinion that each of the above-described failures of Dr. Bolton, Dr. Russell, Dr. Suominen, PA Dizney, Nurse McElravy, Nurse Hammonds, and Nurse Gill to meet the reasonable, prudent, and accepted standards of medical, nursing and health care in the diagnosis, assessment, care and treatment of [Mr.] Smith's post-operative and clinical conditions, separately and collectively, probably caused Mr. Smith to experience a worsening of his physical and mental conditions leading to his pulling out the Quinton catheter resulting in significant and severe bleeding that led to his hemorrhagic cardiopulmonary arrest with pulseless electrical activity, resuscitation, additional deterioration, and his death . . . .

Dr. Bolton and Dr. Russell's failures to be notified [by Nurse McElravy] of Mr. Smith's severe abnormal anticoagulation condition, as demonstrated by his incalculable and undetermined INR as of July 4, 2006, due to his abnormally high protime (greater than 120 seconds), allowed his excessive anticoagulation condition to continue unrecognized and uncorrected.

If Dr. Suominen, PA Dizney or Nurse McElravy had properly evaluated Mr. Smith's conditions and notified Dr. Bolton and Dr. Russell of such conditions, then in all probability, Mr. Smith's state of excessive anticoagulation would have been recognized and corrected because the applicable standards of medical care for Dr. Bolton and Dr. Russell would have required them to take such action under the circumstances. Unfortunately, Mr. Smith's state of excessive anticoagulation continued and the administration of large doses of narcotic pain medications

17

administered by Nurse Hammonds to Mr. Smith on the evening of July 4, 2006, in all probability led to disorientation and neurological impairment in Mr. Smith such that he was able to self-remove the left internal jugular Quinton catheter causing massive hemorrhage leading to exsanguinating cardiopulmonary arrest. Although the sequence of events leading up to Mr. Smith's hemorrhagic arrest is not accurately or completely documented in the [Hospital] medical record, it is likely that Mr. Smith's neurological impairment, caused by the large doses of narcotic pain medications for the above-discussed reasons, allowed him to avoid suffering the significant pain of self-removal of the Quinton catheter from his neck and not be alarmed by the subsequent massive hemorrhage he experienced and summon the [Hospital] nursing staff for help.

Dr. Suominen's failure to adequately secure the Quinton catheter to Mr. Smith's neck and Nurse McElravy's failure to cause to be ordered[] soft wrist restraints in the setting of Mr. Smith's altered level of consciousness allowed this series of events to occur where Mr. Smith was able to pull out the Quinton catheter and experience massive bleeding. If Dr. Suominen had adequately secured the Quinton catheter in Mr. Smith's neck and if Nurse McElravy had caused to be ordered[] soft wrist restraints in the setting of Mr. Smith's altered level of consciousness this series of events where Mr. Smith was able to pull out the Quinton catheter and experience massive bleeding in all lilklihood [sic] would not have occurred and would not have progressed to cardiopulmonary arrest.

Nurses Hammonds['] and Gill's failures to properly and adequately monitor Mr. Smith's above-described activities and conditions resulted in their failures to timely and properly recognize his removal of the Quinton catheter and the bleeding from the catheter site before he experienced hemorrhagic cardiopulmonary arrest. . . . Nurses Hammonds and Gill failed to closely monitor Mr. Smith's conditions for a period of at least 30 to 45 minutes before Hammonds['s] discovery of Mr. Smith's hemorrhagic arrest. If Nurses Hammonds and Gill had timely discovered Mr. Smith's self-removal of the Quinton catheter within 30 to 45 minutes before arrest, and implemented proper interventional procedures, it is likely that Mr. Smith's significant bleeding condition could have been stopped and would not have progressed to cardiopulmonary arrest. Although Mr. Smith's clinical condition had a mortality of about twenty percent prior to the arrest, the

above-discussed failures of Dr. Bolton, Dr. Russell, Dr. Suominen, PA Dizney, McElravy, Hammonds, and Gill probably led to the arrest and the sequelae that probably ensued and in reasonable probability led to his progressive weakness, increasing renal dysfunction, and multi-system organ failure and his death.

These statements, all contained within the four corners of Dr. Halkos's report, sufficiently link Dr. Halkos's causation opinions to the facts and adequately describe the chain of events allegedly leading to Mr. Smith's death. *See Patel v. Williams*, 237 S.W.3d 901, 905–06 (Tex. App.—Houston [14th Dist.] 2007, no pet.) (holding expert report sufficiently set forth causation when it presented a chain of events beginning with a contraindicated prescription and ending with the patient's death). The trial court acted within its discretion in finding that Dr. Halkos's report sufficiently address the element of causation.[3]

We overrule the Hospital's sole issue.

## VII.  Conclusion

Having overruled the Hospital's sole issue, we affirm the trial court's order.


ANNE GARDNER
JUSTICE

PANEL:  LIVINGSTON, C.J.; GARDNER and WALKER, JJ.

DELIVERED:  May 20, 2010

---

[3] The Hospital also argues that Nurse Hayman is not qualified to render causation opinions.  We need not address this argument, however, because Dr. Halkos's report, without reference to Nurse Hayman's report, sufficiently addresses the causation element in the Smiths' claim against the Hospital.  *See* Tex. R. App. P. 47.1.

19