02-10-313-CV












 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 COURT OF APPEALS
 SECOND DISTRICT OF TEXAS
 FORT WORTH
  
 NO.
 02-10-00313-CV
 
 


 

 


 
 
 Gerald Robert Stephenson, M.D.
 
 
  
 
 
 APPELLANT
 
 
 
 
  
 V.
  
 
 
 
 
 Natasha Miller, Individually and as the Surviving
 Spouse, Heir at Law, Community Survivor, and Personal Representative of Steve
 Miller, Deceased, and as Mother, Next Friend and Joint Managing Conservator
 of Jaylynn DeNique
 Miller, DEYLIN RAESHAWN
 MILLER, AND JACOBE ANTONIO MILLER, MINORS, AND AS
 COMMUNITY SURVIVOR AND BENEFICIARY OF THE ESTATE OF STEVE MILLER, DECEASED,
 and AS BENEFICIARY, PURSUANT TO THE TEXAS WRONGFUL DEATH STATUTE AND TEXAS
 SURVIVAL STATUTE; AND CYNTHIA MILLER, INDIVIDUALLY AND AS THE SURVIVOR, HEIR
 AT LAW, AND BENEFICIARY PURSUANT TO THE TEXAS WRONGFUL DEATH STATUTE And
 Texas survival statute, AND AS JOINT MANAGING CONSERVATOR OF JAYLYNN DENIQUE MILLER, DEYLIN RAESHAWN MILLER, AND JACOBE ANTONIO MILLER, MINORS
 
 
  
 
 
 APPELLEES
 
 
 
 
 
 
 
 


 

----------

 

FROM THE 236th District Court OF Tarrant COUNTY

----------

 

MEMORANDUM
OPINION[1]

----------

 

Gerald
Robert Stephenson, M.D. appeals from the trial court’s interlocutory order
refusing to dismiss the health care liability claims of appellees
Natasha Miller, in her individual and other capacities, and Cynthia Miller,
individually and in her other capacities.  In two issues, appellant
challenges the expert reports proffered by appellees
as to standard of care and causation.  We affirm.

Procedural
Background

Appellees
sued appellant, a surgeon who transplanted a kidney into Steve Miller, alleging
that Miller died after appellant failed to recognize signs of postoperative
bleeding, failed to timely order labs that would have purportedly diagnosed the
bleeding at an earlier time, and failed to institute timely and appropriate
therapies that would have prevented Miller’s death from cardiac arrest. 
Appellant filed a motion to dismiss for failure to file an adequate expert
report, which the trial court denied.

Standard
of Review

A
trial court=s decision on a motion to dismiss under
section 74.351 is subject to an abuse of discretion standard.  See, e.g., Am. Transitional Care Ctrs.
of Tex., Inc. v. Palacios, 46 S.W.3d 873, 875
(Tex. 2001).  To determine whether a trial court abused its
discretion, we must decide whether the trial court acted without reference to
any guiding rules or principles; in other words, we must decide whether the act
was arbitrary or unreasonable.  Downer v. Aquamarine Operators, Inc.,
701 S.W.2d 238, 241–42 (Tex. 1985), cert. denied,
476 U.S. 1159 (1986).  Merely because a trial court may decide a matter
within its discretion in a different manner than an appellate court would in a
similar circumstance does not demonstrate that an abuse of discretion has
occurred.  Id. at 242.  A trial court
does not abuse its discretion if it commits a mere error in judgment.  See E.I. du Pont de Nemours & Co. v. Robinson, 923 S.W.2d 549, 558 (Tex. 1995).

Expert
Report Requirements

In a
health care liability claim, a claimant must serve on each defendant an expert
report that addresses standard of care, liability, and causation no later than
the 120th day after the claim is filed.  Tex. Civ. Prac. & Rem. Code Ann. '
74.351(a), (j) (West 2011); Barber v. Mercer, 303 S.W.3d
786, 790 (Tex. App.––Fort Worth 2009, no pet.).  If an expert report has
not been served on a defendant within the 120‑day
period, then on the motion of the affected defendant, the trial court must
dismiss the claim with prejudice and award the defendant reasonable attorney=s
fees and costs.  Tex. Civ. Prac.
& Rem. Code Ann. ' 74.351(b); Barber,
303 S.W.3d at 790.  A report Ahas not
been served@ under the statute when it has been
physically served but it is found deficient by the trial court.  Lewis v. Funderburk, 253 S.W.3d 204, 207–08 (Tex. 2008); Barber, 303 S.W.3d at 790B91. 
When no report has been served because the report that was served was found to
be deficient, the trial court has discretion to grant one thirty-day extension
to allow the claimant the opportunity to cure the deficiency.  Tex. Civ. Prac. &
Rem. Code Ann. ' 74.351(c); Barber, 303 S.W.3d
at 791.

A
report is deficient (therefore subjecting a claim to dismissal) when it Adoes not
represent an objective good faith effort to comply with the definition of an
expert report@ in the statute.  Tex. Civ. Prac. &
Rem. Code Ann. ' 74.351(l); Barber, 303 S.W.3d at 791.  While the expert report Aneed not
marshal all the plaintiff’s proof,@
Palacios, 46 S.W.3d at 878, it must provide a
fair summary of the expert=s opinions as to the Aapplicable
standards of care, the manner in which the care rendered by the physician or
health care provider failed to meet the standards, and the causal relationship
between that failure and the injury, harm, or damages claimed.@ 
Tex. Civ. Prac. & Rem. Code Ann. '
74.351(r)(6); Barber, 303 S.W.3d
at 791.

To
qualify as a good faith effort, the report must Adiscuss the
standard of care, breach, and causation with sufficient specificity to inform
the defendant of the conduct the plaintiff has called into question and to
provide a basis for the trial court to conclude that the claims have merit.@ 
Palacios, 46 S.W.3d at 875; Barber, 303
S.W.3d at 791.  A report does not fulfill this
requirement if it merely states the expert=s
conclusions or if it omits any of the statutory requirements.  Palacios,
46 S.W.3d at 879; Barber,
303 S.W.3d at 791.  The information in the report
Adoes not
have to meet the same requirements as the evidence offered in a summary‑judgment proceeding or at trial.@  Palacios, 46 S.W.3d at 879; Barber, 303 S.W.3d
at 791.  When reviewing the adequacy of a report, the only information
relevant to the inquiry is the information contained within the four corners of
the document alone.  Palacios, 46 S.W.3d
at 878; Barber, 303 S.W.3d at 791; see
Bowie Mem’l
Hosp. v. Wright, 79 S.W.3d 48, 52 (Tex.
2002).  This requirement precludes a court from filling gaps in a report
by drawing inferences or guessing as to what the expert likely meant or
intended.  Barber, 303 S.W.3d at 791; see
Austin Heart, P.A. v. Webb, 228 S.W.3d 276, 279 (Tex. App.––Austin 2007, no pet.) (citing Bowie Mem=l
Hosp., 79 S.W.3d at 53).

“[I]t
is not enough that the expert report ‘provided insight’ about the plaintiff’s
claims.  Rather, to constitute a good-faith effort to establish the
causal-relationship element, the expert report must fulfill Palacios’s
two-part test.”  Bowie Mem’l Hosp., 79 S.W.3d at 52 (citation omitted); Farishta
v. Tenet Healthsystem Hosps.
Dallas, Inc., 224 S.W.3d 448, 453 (Tex. App.––Fort Worth 2007, no pet.). 
The expert “must explain the bases of the statements [made regarding causation]
and link his or her conclusions to the facts.”  Farishta,
224 S.W.3d at 453–54 (quoting Longino
v. Crosswhite, 183 S.W.3d
913, 917–18 (Tex. App.––Texarkana 2006, no pet.)).  The report must
provide enough information within the document to both inform the defendant of
the specific conduct at issue and to allow the trial court to conclude that the
suit has merit.  Bowie Mem’l Hosp., 79 S.W.3d. at 52.

Analysis

In
two issues, appellant challenges the adequacy of the expert reports provided by
appellees because (1) the standard of care and breach
opinions lump all the doctors together collectively and (2) the causation
opinions lump all the doctors together and fail to specify how the breaches
caused Miller’s death or specifically link those breaches to the cause of
death.

Standard
of Care

Dr.
Ronald Ferguson, appellee’s first expert, had over
thirty years’ experience in the “practice of transplant surgery and the care of
kidney transplant patients.”  He opined that appellant was aware of Miller’s
postoperative hematocrit drop to 21.7[2] and elevated potassium of 8.8; a note
from appellant the morning after surgery notes the potassium of 8.8 “and the
delayed graft function (DGF) of the transplanted
kidney.”  It also notes that Miller “would be scheduled to be hemodialyzed ‘today.’”  At 8:03 a.m. the morning after
surgery, appellant made a requisition for 1 gram of calcium gluconate
by IV for Miller.

Dr.
Ferguson noted that appellant was an independent contractor of Harris Methodist
Hospital and that he was bound by their Renal Transplant Program 2006 Protocol
guidelines.  According to Dr. Ferguson,

The transplant
surgeon is to be available post-operatively for the usual post-operative care,
[and] for consultation with the Medical Director, including the occurrence of
possible surgical problems.  Concurrently, the nephrologists are
responsible for the management of the transplant patients
post-operatively.  In the case of Steve Miller, nephrologists Linh Le, M.D., Rubina Khan, M.D.,
Shane Kennedy, M.D., and Charles Andrews, M.D., all part of Dialysis
Associates, were to be responsible for the care of Steve Miller.

 

In addition to the
above operational guidelines set by the Protocol for the Kidney Transplant
Program and Unit, the Protocol set had established guidelines for the Post
Operative Management of the Transplant Recipient.  The protocol is their
standard of care for the post-operative care and management of a kidney
transplant recipient.

 

According to the Harris
Methodist Hospital – Fort Worth Renal Transplant Program 2006 Protocol,
applicable to the care of Steve Miller on April 2nd and 3rd,
2007, . . . Gerald R. Stephenson, M.D. . . . failed to
implement this Protocol in the care of Steve Miller by failing to assess,
monitor, and/or communicate Steve Miller’s fractional urine output that was
significantly lower than the 500 cc per four hours set as the standard
quantitative guideline of the Protocol.

 

Steve
Miller, whose urine output post-operatively, was less than 20cc
per hour since surgery, necessitated laboratory monitoring every four hours.  Accordingly,
the Protocol dictated that a complete blood count (CBC)
and basic metabolic panel (BMP) were to be analyzed every four hours until
routine labs the following morning.  This Protocol, had it been
implemented as dictated, would have provided a CBC,
including a hemoglobin and hematocrit, and a BMP,
which included a potassium level, at 9:30 p.m., 1:30 a.m., and 5:30 a.m. 
This pattern of monitoring was critical in the care denied Steve Miller.

 

. . . .

 

. . . Gerald Robert
Stephenson, M.D., failed to implement Harris Methodist Hospital – Fort Worth –
Renal Transplant Program 2006 Protocol and obtain on Steve Miller a complete
blood count and basic metabolic panel every four hours post-operatively until
morning, necessitated by his oliguric status. 
The protocol recognizes the minimal standard set forth in the community for
kidney transplant patients.  The standard approach recognized for
laboratory monitoring in the first 24 hours post renal transplant would be to
obtain testing for hemoglobin, hematocrit, and
electrolytes (at least) every six hours for the first twenty four hours post
transplant. . . .

 

Had their own Protocol
been implemented, or the community standard cited above, Steve Miller’s
post-operative bleeding and hyperkalemia[[3]] would have
been detected at a much earlier time allowing much earlier treatment.

 

. . . .

 

●       
Dr. Stephenson is documented in the nursing records to be at Steve Miller’s
bedside at 7:30 a.m. on April 3, 2007.

 

. . . .

 

●       
Christina Collier, R.N. reports that “Dr. Stephenson was actually in the unit
making rounds, so I provided him with a copy of the morning labs.  This
was approximately 7:30 a.m. on April 3, 2007. . . .[”]

 

●       
Christina Collier, R.N., reports that Dr. Stephenson was at Steve Miller’s
bedside at 7:30 a.m., and documents it in the nurse’s notes.  Further
documentation by Nurse Collier notes that “Dr. Kahn and Dr. Stephenson aware”
of Steve Miller’s laboratory values, including his potassium of 8.8 and his hematocrit of 22.7.

 

. . . .

 

In addition to having
the critical, life threatening potassium level, indicating his severe hyperkalemia, Steve Miller was also hypovolemic,[[4]]
having critically low hematocrit and hemoglobin
values that were made known to Drs. Stephenson and Khan at 7:25 a.m., on 4/3/07. 
At this time, Steve Miller’s condition was extremely critical and life
threatening.  Mr. Miller’s kidney had produced very little urine (oliguria) and the hematocrit and
hemoglobin values indicated an internal hemorrhage.  As indicated before,
the accepted standard for medical care for such a patient in critical condition
would require urgent therapy with intravenous Calcium Gluconate
or an insulin and glucose combination. . . .

 

. . . .

 

Furthermore,
[although Dr. Khan ordered 1 gram of calcium gluconate
“now”] neither Dr. Khan nor Dr. Stephenson took responsibility to assure that
the Calcium Gluconate was immediately processed and
administered.  In fact, Dr. Stephenson testifies that he left the entire
clinical emergency management of Steve Miller up to Dr. Khan, absent the
ordering [of] an advancement of Steve Miller’s diet to ‘clear liquids’.

 

Drs. Khan and
Stephenson,
Nurses Laureano, Collier, and Dickerson, Harris
Methodist Fort Worth Hospital and its health care providers, each had a
duty, as respective medical doctors, registered nurses and health care
providers of Harris Methodist Hospital – Fort Worth, to Steve Miller, in an
emergency situation, to see that the ‘Now’ order was immediately communicated
to the pharmacy, [and] processed and administered to Steve Miller within one
hour.  Steve Miller was administered the Calcium Gluconate
over two hours later.  This is below the standard of care for medical
doctors, specifically Rubina Khan, M.D. and Gerald
Stephenson, M.D. . . .

 

. . . .

 

1.           
The
standard of care for a post-operative kidney transplant patient is to have a
blood assessment, at the very minimum, every six hours, post-operatively, which
would include a basic metabolic panel.  The standard of care would
require that both the surgeon, in this case, Dr. Gerald Stephenson, M.D., and
the nephrologist group (Dialysis Associates), and the
individual nephrologist, in this case, Linh Le, M.D., Shane Kennedy, M.D. and Rubina
Khan, M.D., would be responsible for seeing that such order was entered. .
. .

 

. . . .

 

3.      
The medical records do not indicate that either Drs. Stephenson or Khan
properly diagnosed the fact that Steve Miller was hypovolemic
as a result of an internal hemorrhage, which was causing his low hematocrit and hemoglobin levels (as well as the critical
potassium value of 8.8).  The calcium gluconate,
together with the insulin glucose combination should have been given
intravenously and immediately.  The accepted standard of care would
require the proper diagnosis be made of Steve Miller’s critical condition that
he was bleeding internally, and thus, hyperkalemic,
and the standard of care would require that he be administered the above
therapy intravenously and that both Drs. Khan and Stephenson should have
made certain that this order was carried out and that therapy was given
immediately.  It was a violation of the standard of care for them not to
do so. . . .

 

4.      
It was a violation of the standard of care to not order the intravenous timely administration
of Calcium Gluconate or the insulin glucose
combination as well as dialysis, without ultrafiltration.
. . .

 

         
. . . Both Drs. Stephenson and Khan failed to treat the primary cause of
Steve Miller’s hyperkalemia, the post-operative bleeding. 
The accepted standard of care for a post-operative kidney patient, such as
Steve Miller, would have been not to decrease his fluid volume, created quite
possibly by surgical post-operative bleeding, and to treat medically his hyperkalemia.  Rubina Khan,
M.D. and Gerald Robert Stephenson, M.D. failed to perform any of these that
were required by the accepted standards of care, for a patient of Mr. Miller’s
condition.  Furthermore, it is a violation of the standard of care by both Rubina Khan, M.D. and Gerald
Robert Stephenson, M.D., both of whom had the responsibility for Steve Miller
upon examining him at 7:25 a.m., on 4/03/07, to order and/or permit him to
receive ultrafiltration . . . .  The
standard of care for the nephrologist on duty in the
early morning hours of 4/03/07, . . . as well as . . . Dr. Stephenson, the
kidney transplant surgeon, was to diagnose Steve Miller as suffering from
post-operative bleeding which required immediate treatment . . . .  Rubina Khan, M.D. and Gerald Robert Stephenson, M.D. failed
to take any of the appropriate actions necessary to treat the extremely
critical conditions caused by Steve Miller’s post-operative bleeding. 
[Emphasis added.]

 

Dr.
Gallon, appellees’ second expert, had over ten years’
experience in the practice of transplant surgery and the care of transplant
patients.  He states in his report that the nephrologists were responsible
for postoperative management of transplant patients and that “[t]he transplant
surgeon, Gerald Robert Stephenson, M.D., was concurrently responsible for Steve
Miller’s post-operative monitoring, care and intervention as it related to the
surgical procedure and potential complications and/or issues related to the
kidney allograft.”

“Concurrent”
is defined as “[o]perating at the same time[,]… covering the same matters.”  Black’s Law
Dictionary 331 (9th ed. 2009).  A reasonable construction of Dr.
Ferguson’s and Dr. Gallon’s use of the word “concurrently” in their reports is
that Dr. Stephenson was to be available for the usual post-operative care of
Miller and that he was to be responsible for the post-operative management of
Miller along with the nephrologists.  Thus, any references in the report
to a joint standard of care involving the post-operative management of Miller
would be appropriate.  See, e.g., Barber v.
Dean, 303 S.W.3d 819, 831 (Tex. App.––Fort Worth
2009, no pet.).  The excerpts above show that
both Dr. Ferguson and Dr. Gallon concluded and opined that under Harris’s
Protocol, as well as prevailing standards of care for post-operative care and
management of a patient, the transplant surgeon was responsible for both
post-operative care and management of a patient like Miller.  Both
reports clearly state that the articulated standards of care are applicable to
both Dr. Stephenson and the nephrologists; Dr. Ferguson’s report also states
how Dr. Stephenson as well as the nephrologists breached that standard. 
Thus, the expert reports proffered by appellees
fulfill their statutory purpose:  to provide enough information within the
document to both inform the defendant of the specific conduct at issue and to
allow the trial court to conclude that the suit has merit.  See Bowie Mem’l Hosp., 79 S.W.3d. at
52.

We
overrule appellant’s first issue.

         
Causation

         
Appellant further contends that Dr. Ferguson’s and Dr. Gallon’s reports are
deficient because they are conclusory and “also lump all physicians and
defendants together for causation.”

         
Appellant contends that appellees’ experts failed to
explain how he is linked to Miller’s cardiac arrest, which occurred during ultrafiltration by Dr. Khan, the nephrologist. 
According to appellant, the court must make improper inferences to “glean
precisely how it is that the care of Appellant Dr. Stephenson himself . . .
caused the death of the patient.”  He contends Dr. Gallon’s report fails
for the same reason because it is “not surprisingly identical to [that] of Dr.
Ferguson.”

         
Dr. Ferguson opined as follows:

         
Had their own Protocol been implemented, or the
community standard cited above, Steve Miller’s post-operative bleeding and hyperkalemia would have been detected at a much earlier
time allowing much earlier treatment.

 

. . . .

 

3.      
The critical potassium value indicating the hyperkalemia
condition that could immediately cause a patient to develop life-threatening
arrhythmia required aggressive treatment as soon as that condition was
diagnosed by the blood sample that was drawn at 3:40 a.m. . . . [A]t 7:25 a.m.,
on 4/3/07 . . . Steve Miller’s condition was extremely critical and
life-threatening.  Mr. Miller’s kidney had produced very little urine (oliguria) and the hematocrit and
hemoglobin values indicated an internal hemorrhage. . . .

 

4.      
. . . The ultrafiltration removed fluid volume from
Steve Miller who was already presenting with a compromised hypovolemic
condition, and was the finishing catalyst in Steve Miller’s hemodynamic[[5]] collapse and a contributing
cause to his death at 11:27 a.m. on 4/3/07.

 

. . . . Due to the
cumulative effect of the negligent care, aggressive medical management of the hyperkalemia, followed by an operation to control bleeding
or intraoperative dialysis, with life-support
measures, accompanied by surgical repair of the postoperative bleeding, were at
the time, (7:25 a.m.), the only heroic and plausible interventions to save the
life of this 24 year-old young man.

 

. . . .

 

. . . [Miller] died of
a cardiac arrest while in dialysis in a state of uncontrovertible
ventricular tachycardia. . . .  He experienced postoperative bleeding that
caused dangerous hyperkalemia.  A decision to
use dialysis to treat the life threatening hyperkalemia,
rather than, or in addition to, aggressive medical management, was made. 
While on dialysis, ultrafiltration led to hypotension
as it frequently does in the early post-transplant dialysis setting and
definitely does in a compromised hypovolemic
post-surgical state.  This was not recognized, but in fact, more fluid
volume was removed by ultrafiltration that
exacerbated rather than improved the hypotension and hypovolemic,
thus setting up an environment of uncorrected hyperkalemia
(repeat potassium in dialysis of 7.9), acidosis (arterial pH of 7.166),
hypotension, hypovolemic, hypoxia, and ventricular
tachycardia.  Given this setting and environment, it is not surprising
that the ventricular tachycardia could not be successfully reversed and became
the ultimate cause of death.

 

. . . .

 

Each of the standards
of care as I have indicated above was a proximate cause of the death of Steve
Miller. . . .  Earlier, had he received the proper treatment, Steve
Miller, in all reasonable medical probability, would have resulted in his being
able to survive the post-operative bleeding. . . .  The failure to
properly treat Steve Miller’s condition by Rubina
Khan, M.D., Shane Kennedy, M.D., Gerald Robert Stephenson, M.D. and Patricia Fenderson, M.D. [the Director of Harris Methodist Hospital
– Fort Worth], combined with the failure of the nurses and health care
providers . . . all of which . . . caused Steve Miller to ultimately go into
cardiac arrest from which he could not be resuscitated, thus, causing his
death.  Each of the above violations of the standard of care was a
proximate cause of Steve Miller’s death.

 

         
Earlier in his report, Dr. Ferguson faults Dr. Stephenson for breaching the
following standards of care:  failing to ensure the Protocol was
implemented as to timely CBC and BMP laboratory
tests, failing to ensure that Dr. Khan’s “now” order for calcium gluconate was immediately processed, failing to diagnose
and treat the primary cause of Miller’s hyperkalemia,
which was the postoperative bleeding, and allowing Dr. Khan to order ultrafiltration when it was not indicated.  In his
report, he states that had the Protocol been implemented, Miller’s hyperkalemic condition would have been evident earlier and
would not have eventually progressed to ventricular tachycardia. 
According to Dr. Ferguson, Dr. Stephenson’s failure to diagnose the underlying
cause of Miller’s hyperkalemia and his allowing the ultrafiltration exacerbated that continuing hyperkalemic condition, which eventually led to
irreversible ventricular tachycardia.  Dr. Ferguson’s report describes a
chain of omissions that each had the effect of further exacerbating Miller’s
condition until it became irreversible.  See, e.g.,
Menefee v. Ohman,
323 S.W.3d 509, 519–20 (Tex. App.––Fort Worth 2010,
no pet.); Presbyterian Cmty. Hosp.
of Denton v. Smith, 314 S.W.3d 508, 518–19 (Tex.
App.––Fort Worth 2010, no pet.); see also Del Lago
Partners, Inc. v. Smith, 307 S.W.3d 762, 774
(Tex. 2010) (holding that there may be more than one proximate cause of an
event).

Accordingly,
we conclude and hold that Dr. Ferguson’s opinions on causation are not
conclusory, nor do they fail for lack of specificity as to Dr. Stephenson, with
respect to each of the alleged standard of care violations except for the
failure to ensure the timely administration of calcium gluconate
or insulin.  Dr. Ferguson does not explain how that failure was a
proximate cause of Miller’s death.  However, Dr. Gallon states in his
report that intravenous calcium gluconate would
“stabilize the myocardium” and an insulin/glucose combination would “treat the hyperkalemia.”  Thus, reading both reports together,
the alleged failure to ensure the timely administration of the proper
medication was another omission in the chain that led to the exacerbation of
Miller’s hyperkalemia and ultimate cardiac
arrest.  See Tex. Civ. Prac. & Rem. Code Ann. § 74.351(i); Davisson
v. Nicholson, 310 S.W.3d 543, 558 (Tex.
App.––Fort Worth 2010, no pet.) (op. on reh’g);
Packard v. Guerra, 252 S.W.3d 511, 526–27
(Tex. App.––Houston [14th Dist.] 2008, pet. denied) (holding that we must
review multiple reports “in the aggregate” to determine if they are adequate as
to liability and causation).

         
We conclude and hold that the trial court did not abuse its discretion by
determining that the expert reports proffered by appellees
constituted a good faith effort to comply with the statute.  We overrule
appellant’s second issue.

Conclusion

         
Having overruled both of appellant’s issues, we affirm the trial court’s order.

 

 

 

 

TERRIE LIVINGSTON
CHIEF JUSTICE

 

PANEL: 
LIVINGSTON, C.J.; MEIER, J.; and DIXON W. HOLMAN
(Senior Justice, Retired, Sitting by Assignment).

 

DELIVERED:  July 28,
2011














[1]See
Tex. R. App. P. 47.4.





[2]In
some parts of the report, Dr. Ferguson refers to the hematocrit
drop as being to 21.7, and in others, he refers to it as being 22.7. For
purposes of this opinion, the difference is not significant. 





[3]Hyperkalemia is “[a] greater than normal concentration of
potassium ions in the circulating blood.”  Stedman’s
Med. Dictionary 921 (28th ed. 2006).





[4]Hypovolemic means having “a decreased amount of blood in
the body.”  Id. at 939.





[5]Hemodynamic
means “[r]elating to the physical aspects of the
blood circulation.”  Id. at 868.